UNITED STATES DISTRICT COURT
DISTRICT COURT OF DELAWARE

-------------------------------------------------------------X

| | |
|---|---|
| HAWK MOUNTAIN LLC, a Delaware limited liability company, GIGI JORDAN, in her capacity as manager of the Hawk Mountain LLC, and settlor of the Hawk Mountain Trust, and in her individual capacity, MICHELLE E. MITCHELL, ESQ., Trustee of the Intercession Trust, beneficiary of the Hawk Mountain Trust, and KIM JORDAN, in her Capacity as Beneficiary of the Intercession Trust, | FEDERAL RICO COMPLAINT |

Plaintiffs,                          C.A. No. _____

- against -

| | |
|---|---|
| RAM CAPITAL GROUP, LLC, a Delaware limited liability company, RAM REALTY HOLDINGS, LLC, a Delaware limited liability company, ALLION HEALTHCARE INC., a Delaware Corporation, presently doing business as BIOMED HEALTH CARE HOLDINGS, INC.,VASGENE THERAPEUTICS, INC., a California corporation, PRIDECARE, INC., a New York corporation, STONE RIDGE ENTERPRISES, LLC., a Delaware limited liability company, ADVANCE RESEARCH CORPORATION, INC., a Florida Corporation, ATLAS RESPIRATORY SERVICES, INC., FORMERLY, ATLAS MEDICAL EQUIPMENT, INC., a Delaware Corporation, JOSEPH A. TROILO, JR., ESQ., BRUCE KOLLEDA, JOSEPH TROPIANO, BERNARD EIZEN, ESQ., MARK KOVINSKY, JOSEPH T. MOLIERI, ESQ., F. GILLIS GREEN, DANIELLE STEWART, BARI KUO, RENEE M.SIGLOCH, and MICHAEL BONVENTURE, | DEMAND FOR JURY TRIAL |

Defendants.

-------------------------------------------------------------X

1

The Plaintiffs herein, by and through their undersigned counsel, complaining of the defendants, set forth the following:

**SUMMARY OF THE ACTION**

1.      This is an action for (1) substantive violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), specifically violations of 18 U.S.C. 1341 (relating to mail fraud), section 1343 (relating to wire fraud), and section 1344 (relating to financial institution fraud),  (2) conspiracy in violation of RICO; (3) common-law fraud, and (4) aiding and abetting fraud.  In essence, the actions of a group of individuals, hereinafter "the Enterprise," comprising the individual defendants named herein, and their fraudulent conduct in the creation and maintenance and plunder of an entity known as the HAWK MOUNTAIN LLC hereinafter the "HM LLC", intended to hold the assets of a Trust, established in the name of the HAWK MOUNTAIN TRUST hereinafter "the HM Trust."

2.      The Enterprise defrauded Gigi Jordan, individually through fraudulent inducements, from its inception, and in the formation and creation of the HM Trust and the HM LLC, and through actual misrepresentations and forged documents.  Thereafter, the Enterprise utilized a series of forged and/or fraudulent conveyances, documents, correspondence, e-mails, wire transfers, agreements, contracts and other fiduciary documents to convert and steal millions of dollars which was properly the property of the beneficiaries of the HM Trust and the HM LLC, which was alleged by the defendants and member of the Enterprise to hold all of the assets of HM Trust.  This conduct was carried

out through use and misuse of the United States mail, telephone lines and electronic Internet communications and submissions.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which allows the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1962.

4.      This Court has personal jurisdiction over the parties, as the actions which constitute the violations of 18 U.S.C. § 1962(c) and (d) were conducted in relation to the creation and maintenance of the HM, LLC established on December 3, 2002, and the HM Trust formed on December 12, 2002, both established under the laws of Delaware. Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b) for violations of 18 U.S.C. § 1962 as long as the Court has personal jurisdiction over at least one party.

**PARTIES**

**The Plaintiffs**

5.      Plaintiff Hawk Mountain LLC (the "HM LLC" or "Hawk Mountain LLC") is a Delaware limited liability company that was established concurrently with the Hawk Mountain Trust.  It was actually formed on December 3, 2012.

6.      Plaintiff Gigi Jordan in an individual capacity engaged in the creation and formation of the HM Trust and HM LLC.[1]   In her capacity as manager (the "Manager") of the HM LLC, and later the Settlor, she was the initial, and at one time, sole member of the LLC and as Manager was solely and exclusively authorized to manage the business and affairs of the HM LLC, Gigi Jordan as Manager, Settlor and in her individual capacity was the victim of the fraud perpetrated by defendants Troilo, Kolleda and other members of the Enterprise.

7.      Plaintiff Michelle E. Mitchell, Esq. ("Mitchell"), in her capacity as Trustee of the Intercession Trust, is the present beneficiary of the Hawk Mountain Trust.

8.      Plaintiff Kim Jordan, ("Kim") in the beneficiary of the Intercession Trust, having assigned her interest as a beneficiary of the Hawk Mountain Trust to the Intercession Trust.

9.      Non-party Hawk Mountain Trust (the "Trust" or "HM Trust") is a trust established under the laws of Delaware on or about December 12, 2002.  The HM Trust was established for the benefit of Jude Mirra, the minor son of Gigi Jordan the settlor of the Trust. The Trust purportedly does not hold any assets other than the "common member units" of the LLC.

**The Enterprise Defendants**

The following defendants worked together in law and in fact as an enterprise, as that term is defined in 18 U.S.C. 1962, for the express and intended purpose

---

[1] Jordan, as a result of fraudulent inducements by the members of the Enterprise, who were also Jordan's fiduciaries at the time the financial instruments were formed, did execute formation documents for at least a trust called the Hawk Mountain Trust. However, all of the documents subsequently produced by the defendants regarding the HM Trust, other purported trusts, the Operating Agreement of the HM LLC, and other documents related to the formation of the HM Trust were forged with Jordan's name, and are therefore fraudulent.

of misappropriating and converting to their own use the property of the Trust, the HM LLC and its beneficiaries.

10.     Defendant **Joseph A. Troilo, Jr.** ("Troilo") served as in-house counsel for defendant RAM Capital[2] for more than 10 years. Troilo, upon information and belief, now acts as in house counsel to RAM Consulting Group LLC, formed in Delaware on October 19, 2012. Upon information and belief, RAM Consulting Group LLC is affiliated with, controls, or is controlled by other "RAM" entities.  Troilo is one of two trustees, along with Kolleda, of the HM Trust.  Upon information and belief, Troilo is one of two trustees, along with defendant Kolleda, of a purported trust, the Jude Mirra Under The Hawk Mountain Trust. Upon information and belief, Troilo is one of two trustees, along with defendant Kolleda, of a purported trust, the Gigi Jordan Trust F/B/O Jude Mirra. Upon information and belief, Troilo is one of two trustees, along with defendant Kolleda, of a purported, "Hawk Mountain Trust for Jude Mirra"[3], resulting from a purported merger of the HM Trust and the purported Jude Mirra Trust Under the Hawk Mountain Trust, the "latter trust surviving" of such merger, as reported by defendants Troilo and Kolleda. Troilo is one of two Members, along with defendant Kolleda, of the HM LLC.  Troilo has held the following positions at defendant RAM Capital and RAM affiliated entities: secretary of Advanced Laboratory Services, Inc.; officer of Advanced Pharmacy Concepts; incorporator, secretary and director of defendant Advanced Research Corporation; incorporator of Apogenics, Inc.; incorporator

---

[3] Defendants Troilo and Kolleda, in a forged document, the "Receipt Release, Indemnification and Merger Agreement", report the purported merger and formation of this "latter surviving trust". Upon information and belief, the fraudulent merger, as memorialized in the "Receipt Release, Indemnification and Merger Agreement" forged with Jordan's signature, was used to convert the assets of the Hawk Mountain LLC held by the HM Trust to another Trust, not accounted for in the purported merger as discussed in detail below.

of APS Enterprises Holding Company, Inc.; registered agent, secretary, and director of

Atlas Respiratory Services, Inc.; incorporator, director and president of defendant Atlas

Medical Equipment, Inc.; incorporator of Biomed America, Inc.; director of Biomed PA,

Inc.; organizer and secretary of Biomed Texas, Inc.; secretary of Ashland Pharmacy, Inc.;

registered agent and secretary of Complete Communications, Inc.; officer of Empire State

Neurology P.C.; incorporator of Eyegene Corporation; officer of Health and Wellness

Center Inc.; incorporator of Hometech Advanced Therapies, Inc.; director of HomeTech

Therapies, Inc.; director of HomeTech Therapies (PA), Inc. incorporator of Physician

Oncology Network, Inc. ("PONI"); authorized person for Valley Creek Estate, LLC;

secretary and director of RAM Developers, Inc.; authorized person for RAM Capital II

LLC: and director and secretary of defendant Pridecare, Inc. Defendant Troilo is both a

member of the Enterprise and participated in its management and operation, pursuant to

18 U.S.C. section 1962 (a) and (c).

     11.    Defendant **Bruce Kolleda** ("Kolleda") is a certified public accountant and

was an accountant for defendant RAM Capital s and upon information and belief many

other RAM controlled businesses for more than 10 years.  Troilo is one of two trustees,

along with Kolleda, of the Trust. Kolleda is alleged to be one of two trustees, along with

Troilo, of the purported Jude Mirra Under The Hawk Mountain Trust.  Kolleda is alleged

to be one of two trustees, along with Troilo, of the purported Gigi Jordan Trust FBO Jude

Mirra.  Upon information and belief, Kolleda is one of two trustees, along with defendant

Troilo, of a purported, "Hawk Mountain Trust for Jude Mirra,"[4] resulting from a

purported merger of the HM Trust and the purported Jude Mirra Trust Under the Hawk

Mountain Trust, the "latter trust surviving" of such merger, as reported by defendants

---

[4] *See* fn 4, *supra.*

Troilo and Kolleda. Kolleda is one of two members, along with Troilo, of the HM LLC.

Kolleda has held the following positions at defendant RAM Capital and RAM affiliated

entities: CFO of HomeTech Therapies, Inc.; CFO of HomeTech Therapies (PA), Inc.;

treasurer of Pridecare Inc.; CFO of Retrodyne Corporation; and CFO and treasurer of

Specialty Pharmacy, Inc. Defendant Kolleda is both a member of the Enterprise and

participated in its management and operation, pursuant to 18 U.S.C. section 1962 (a) and

(c).

        12.     Defendant **Joseph Tropiano** ("Tropiano") was one of defendant RAM

Capital's accountants. Tropiano has held the following positions at defendant RAM

Capital and RAM affiliated entities: secretary of Advanced Laboratory Services, Inc.;

treasurer of Ashland Pharmacy, Inc.; vice president of defendant Atlas Medical

Equipment, Inc.; vice president, director, secretary and treasurer of Atlas Respiratory

Services, Inc.; director and treasurer of defendant Advanced Research Corporation;

treasurer of Biomed Texas, Inc.; director of Biomed PA, Inc.; vice president, director and

treasurer of defendant Pridecare, Inc.; registered agent for defendant RAM Capital; CFO,

director and treasurer of RAM Developers, Inc.; registered agent for defendant RAM

Realty; registered agent of  RAM Capital II , LLC; treasurer of RAM Developers; and

registered agent of Valley Creek Estate, LLC.  Defendant Tropiano is both a member of

the Enterprise and participated in its management and operation, pursuant to 18 U.S.C.

section 1962 (a) and (c).

        13.     Defendant **Mark Kovinsky** ("Kovinsky") acted in an executive or official

capacity for RAM Capital for more than 10 years, and has held the following positions at

defendant RAM Capital and RAM affiliated entities: chief information officer (CIO) of

defendant RAM Capital; treasurer of defendant RAM Developers Inc. officer of Access

Therapeutics Inc.; director and treasurer of Advanced Research Corporation; director of

HomeTech Therapies, Inc.; director and incorporator of HomeTech Therapies (PA), Inc.;

treasurer of RAM Developers, Inc.; and treasurer of Cell-Matrix, Inc.   Defendant

Kovinsky was involved in Jordan's tax and estate planning, as well as the formation of

the Trust and the HM LLC. Defendant Kovinsky's involvement as such is documented in

numerous correspondences with co-defendants, Eizen, Troilo and Kolleda.

14.     Defendant **Joseph Molieri** served intermittently over a period of at least

10 years as in house counsel to defendant Ram Capital and has held the following

positions at defendant RAM Capital and RAM affiliated entities: registered agent of

defendant Ram Capital Group, LLC; registered agent of RAM Consultants LLC;

registered agent of RAM Realty Holdings, LLC. Molieri filed six affidavits with the

Delaware Secretary of State, changing the registered agent for the LLC, RAM Capital,

and four other related LLC's from J. Kuo to defendant Tropiano. Upon information and

belief, defendant Troilo forged the affidavit for Jordan as the authorized person for the

change of registered agent for the LLC. Molieri is listed as applicant for foreign

incorporation for Pridecare Inc. in Florida.

15.     Defendant **RAM Capital Group, LLC** (hereinafter RAM Capital"), is a

Delaware limited liability company founded in July 9, 1997 and forfeited August 4, 2000.

The active RAM Capital was formed in Delaware on December 20, 2001.  From

December 4, 2003 though February 2007, RAM Capital Group, LLC, was the recipient

$2,900,000 as a result of eight fraudulent wire transfers, from the bank account for the

LLC. These fraudulent transfers were in furtherance of the business of the enterprise. The

wire transfer authorizations effectuating these transfers were faxed from the offices of defendant RAM Capital to Walsh's office at Merrill Lynch, and bore forged signatures, fraudulently purporting to be Jordan's.  One of the criminal goals of the Enterprise was the protection of the assets of RAM Capital and its satellite subsidiaries and related entities.  Documents that evince the internal organizational structure for multiple "RAM" corporate entities, including defendants RAM Realty Holdings, LLC, Stone Ridge Enterprises, LLC, Delta Pharmaceuticals, Inc., Vasgene Therapeutics, Inc., and Advanced Research Corporation, report RAM Capital as holding a "majority interest" in Vasgene Therapeutics, Inc. As exhaustively detailed below, RAM Capital functioned as a general holding company among several others, organizing a web of companies in which defendants acted as principles, officers employees or agents who engaged in fraud, carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

16.     **Defendant RAM Realty Holdings** (hereinafter "RAM Realty"), is a Delaware limited liability company formed in January 23, 2003. The defendants, Molieri, Kuo and Tropiano hold or have held positions as officers of this company. Documents evince the internal organizational structure for multiple "RAM" corporate entities, including defendants Ram Capital, LLC, Delta Pharmaceuticals, Inc., Vasgene Therapeutics, Inc., and Advanced Research Corporation, report RAM Realty Holdings with a controlling interest in RAM Consultants, LLC and Stone Ridge Enterprises, LLC.

17.     Defendant **Vasgene Therapeutics Inc.** (hereinafter ("Vasgene"), is a California corporation incorporated on September 25, 1998. Documents evince the internal organizational structure for multiple "RAM" corporate entities describe

defendant RAM Capital as a majority interest holder in defendant Vasgene.  RAM

Capital documents from September 2006, valued defendant Vasgene, defendants Delta

Pharmaceuticals, and Cancer Innovations at "$75 – 250, 000 million".

18.     Defendant **Pridecare, Inc.**, is a New York corporation, incorporated on

January 13, 1995, with a foreign incorporation in Florida on December 31, 2003.

Defendant Pridecare offers home nursing care services in New York and Florida.

Defendants Troilo, Kolleda, Tropiano and J. Kuo hold or have held various positions as

officers of defendant Pridecare.  Defendant Pridecare's ownership shares were listed as

security to the 2005 note in the 2005 Schedule $3,000,000 by RAM Capital. RAM

Capital Documents from 2006, valued defendant Pridecare at "$2 - $4 million".

19.     Defendant **Stone Ridge Enterprises LLC**, is a Delaware limited liability

company formed on January 23, 2003 that lists defendant Tropiano as registered agent.

Upon information and belief, defendant Troilo was involved in various transactions

including securing loans and or lines of credit for defendant Stone Ridge. . Documents

evince the internal organizational structure for multiple "RAM" corporate entities,

including defendants Ram Capital, LLC, Delta Pharmaceuticals, Inc., Vasgene

Therapeutics, Inc., and Advanced Research Corporation, report RAM Realty Holdings

with a controlling interest in Stone Ridge Enterprises, LLC.  The ownership shares of

Stone Ridge Enterprises, LLC were listed as security for the 2005 Note in the 2005

Schedule and were valued at $14,000,000 by RAM Capital. RAM Capital documents

from 2006, valued Stone Ridge at "$17.5 million"

20.     Defendant **ARC**, is a Florida corporation, incorporated on December 12,

2000.  Defendants Troilo, Tropiano and Kovinsky hold or have held positions as officers

for this company.  Defendant ARC contracts research and consultation services to the

pharmaceutical industry. Defendant ARC's ownership shares were listed as security to

the 2005 note in the 2005 Schedule and were valued at $3,000,000 by RAM Capital.

RAM Capital documents September of 2006, valued defendant ARC at "$3 - $5 million".

Later, a November 2007 proposal to acquire ARC valued the company at $50,000,000.

Documents that evince the internal organizational structure for multiple "RAM"

corporate entities, including defendants RAM Capital, RAM Realty, Stone Ridge, Delta,

and Vasgene, include ARC as a start up business operating in corporate form with a

majority interest held by "RAM Investment Management, Inc."

21.     Defendant **Delta Pharmaceuticals Inc**., ("Delta"), is a Delaware

Corporation incorporated on September 9, 2002 with Tropiano listed as registered agent.

The internal organizational structure for multiple "RAM" corporate entities, including

defendants RAM Capital, RAM Realty, Stone Ridge, ARC, and Vasgene, include Delta

as a start up business operating in corporate form with a majority interest held by "RAM

Investment Management, Inc., Delta's ownership shares were listed as security to the

2005 note in the 2005 Schedule  $100,000 by RAM Capital.

22.     Defendant **Atlas Respiratory Services, Inc.**, formerly Atlas Medical

Equipment, Inc., ("Atlas") was incorporated November 15, 2004 in Delaware and was a

provider of durable medical equipment at home. Defendants Troilo, Tropiano Kovinsky,

and J. Kuo, held positions as officers of Atlas.  Atlas' ownership shares were listed as

security to the 2005 note in the 2005 Schedule and were valued at $1,000,000 by RAM

Capital. Defendant Allion Healthcare, Inc., acquired Atlas in a merger with Biomed

America Inc.,[5] in March of 2008. An internal RAM Capital Document dated September 30, 2006, valued Atlas at "$3 - $6 million.

23.     Defendant **Allion Healthcare, Inc.**, presently doing business as Biomed Healthcare Holdings, Inc., a Delaware corporation, incorporated on February 3, 1989, is a specialty pharmacy distributer of HIV/AID's medications.   Defendant Allion is the corporate successor in interest of defendant Atlas.  Defendant's RAM Capital, Troilo, Tropiano, Kovinsky, B. Kuo, Molieri, and Sigloch benefitted from the Atlas, Biomed, and Allion merger.  On October 5, 2007, defendant Atlas was sold to Biomed America Inc. ("Biomed"). Thereafter, on March 13, 2008, Biomed entered into a complex $117.8 million merger and acquisition with defendant Allion Healthcare Inc., a Delaware corporation, incorporated on February 3, 1989. [6] On April 4, 2008 defendants Troilo, Tropiano, Kovinsky, B. Kuo, Molieri, and Sigloch entered into a stockholders agreement granting shares of defendant Allion's common stock issued in connection with the acquisition of Biomed. Additionally, SEC filings by defendant Allion evince that defendant RAM Capital agreed to provide services on a transitional basis that were consistent "with the services historically provided by RAM Capital LLC" [to Biomed] in exchange for a monthly fee of $10,000"or longer as mutually agreed by the parties. The terms of the agreement further provided for the payoff of a RAM indebtedness in the amount of $643,535. A January 13, 2010, SEC filing Schedule 14A, states that defendant Allion Healthcare Inc., entered into a "going private" transaction.  Defendants, Troilo, Tropiano, Kovinsky, B. Kuo, Molieri, and Sigloch were listed as rollover stockholders ("the "Rollover Stockholders"), receiving a combination of senior preferred stock, junior

---

[5] Officers of Biomed America, Inc., include Troilo as incorporation and J. Kuo as registered agent.
[6] http://www.reuters.com/assets/print?aid=USBNG31766020080313

preferred stock and common stock in a company formed for the purposes of a merger with H.I.G. Capital, LLC. Defendant Allion became a wholly owned subsidiary of H.I.G. Capital, LLC.[7]

24. Defendant **F. Gillis Green** ("Green") is the incorporator of Physician Oncology Network Inc. (hereinafter "PONI,") a Delaware corporation that was incorporated on July 7, 2005. PONI was also incorporated in October of 2004 and dissolved in February of 2005 by defendant Troilo.

25. Defendant **Bari Kuo** ("B. Kuo") has held executive positions for defendant Ram Capital, and its controlled or affiliated entities for more than 10 years, under the direction of defendants Troilo, Molieri, Tropiano, Kovinsky, Kolleda, and Battaglia. B. Kuo held the position of director of HomeTech Therapies, Inc., and director of HomeTech Therapies (PA), Inc. B. Kuo's deceased husband James Kuo ("J. Kuo") held substantial interests in RAM Capital and RAM-controlled or affiliated entities. . J. Kuo held the following official capacities at RAM controlled or affiliated companies: registered agent for RAM Business Holdings, LLC; registered agent for defendant RAM

---

[7] On 7/17/2012, the U.S. Attorney's Office filed a complaint in the U.S. District Court for the Southern District of New York, alleging a massive Medicaid fraud involving a black market in HIV/AIDS drugs, calling it a "*double dip fraud of gigantic proportions. Our investigation is very much ongoing.*" (Preet Bharara, US Attorney, SDNY Press Release 7/17/12) (emphasis added). The US Attorney of the Southern District of New York, Preet Bharara, called the scheme "the largest single prescription drug diversion scheme ever charged at one time." (Id.) The US Attorney's Office, *Organized Crime Unit's* assistant U.S. Attorneys Jason A. Masimore and Russell Capone are in charge of the prosecution. The US Attorney's complaint identified "pharmacy-1," which bought prescription drugs from the corrupt wholesalers. The identity of "pharmacy-1" was confirmed as **"*Allion Healthcare*"** which ran the MOMS Pharmacy chain. When the news media contacted defendant Allion for comment, they were told only that these frauds were committed "a while ago." Additionally on April 4, 2012, AG Eric T. Schneiderman announced the arrests of four ringleaders distributing HIV medication in a $274 million Black Market prescription drug operation. The AG's Medicaid Fraud Control Unit shut down an illegal operation that was distributing HIV prescription drugs obtained on the Black Market through Mom's pharmacy, a high volume pharmacy in Suffolk County and Brooklyn and ***it's parent company Allion Healthcare***, then dispensed the illegally obtained drugs to Medicaid recipients and billed the NYC Medicaid program for these un-sellable drugs. The defendants included Glenn Schabel, the supervising pharmacist at Moms pharmacy and ***Allion Healthcare*** who allegedly accepted more than $274 million worth of black market HIV medications from ***a web of shell companies.*** (See NY Post, Carl Campanile, *Four busted in $150M HIV/AIDS-Medicaid Drug Scam,* April 4, 2012).

Realty Holdings, LLC; president and director of defendant Pridecare Inc., registered agent for RAM Consultants, LLC; secretary and director of RAM Developers, Inc.; and registered agent for Valley Creek Estate, LLC.  J. Kuo and defendant Kovinsky participated in a sub-merger to a larger public merger that involved the interests of the HM LLC. Upon information and belief B. Kuo, both as executrix and by inheritance of J. Kuo's estate and as an executive employee managed by defendants Troilo, Molieri, Kolleda, and Tropiano continued as interested parties in many of the RAM and RAM affiliated companies that her husband invested in and or held ownership interests in after his death.

26.     Defendant **Danielle Stewart** ("Stewart") has held executive positions for defendant Ram Capital, and its controlled or affiliated entities under the direction of defendants Troilo, Molieri, Tropiano, Kovinsky, and Kolleda, for more than 10 years. Defendant Stewart is also a notary public who, acting in concert with other Enterprise defendants, notarized certain of the false and fraudulent documents at issue.

27.     Defendant **Renee M. Sigloch** ("Sigloch") has held executive positions for defendant Ram Capital, and its controlled or affiliated entities under the direction of defendants Troilo, Molieri, Tropiano, Kovinsky, and Kolleda for more than 10 years. Sigloch acting in concert with other Enterprise defendants, witnessed the forging of multiple false and fraudulent documents at issue.

28.     Defendant **Frederick Forte** ("Forte") worked in various capacities for multiple RAM related entities for more than 10 years. Forte worked under the supervision of Defendants, Defendants Troilo, Tropiano, Kolleda, Kuo, Stewart, Kuo, and Sigloch and witnessed the forging of a key document.

29.     Defendant **Bernard 'Buzz' Eizen** ("Eizen") is a trusts and estates attorney who represented Jordan as settlor of the Trust in 2002, and drafted financial and estate planning documents for her, including the documents for the formation of the Trust and the LLC.  In 2010, after Jude's death, Eizen then represented Kolleda and Troilo (together, as "Trustees") in connection with the Trust and the LLC disputes, in a capacity that was adverse to Jordan.

30.     Defendant **Michael Bonventure** ("Bonventure"), of Morris Cohen, P.C., an accounting firm based in Philadelphia, served as the tax accountant for the HM Trust, the purported Jude Mirra Under The Hawk Mountain Trust, the purported Gigi Jordan Trust FBO Jude Mirra, the purported Hawk Mountain Trust for Jude Mirra, the HM LLC, the RAM Entities and its many other affiliated companies. Defendants Troilo, Kolleda and Eizen worked with Bonventure in preparing tax returns for the Trust, the purported Jude Mirra Under The Hawk Mountain Trust, the purported Gigi Jordan Trust FBO Jude Mirra, the purported Hawk Mountain Trust for Jude Mirra, and the HM LLC.

**Non-Party Enterprise Members**

31.     Non-party **Physician Oncology Network Inc.**, ("PONI"), a Delaware corporation was incorporated in February of 2004 and dissolved in February of 2005 by defendant Troilo. A company by the same name was incorporated "anew" on July 7, 2005 by F. Gillis Green.  The incorporation of PONI in 2005 by Green was *not* a reinstatement of PONI as incorporated by Troilo and, as such, was assigned a new corporate filing number by the Delaware Secretary of State.   On August 9, 2005, PONI was the recipient of a $1,000,000 fraudulent wire transfer from the HM LLC account, faxed from the offices of defendant RAM Capital, to Walsh's office at Merrill Lynch,

based upon a wire transfer authorization bearing a forged signature for plaintiff Jordan. The Green filing of the newly formed incorporation of PONI with the Delaware Secretary of State included an operating agreement that embodied an exhaustively broad release and indemnification provision that inexplicably applied to "previous incorporators, directors or officers of the corporation."  Upon information and belief, defendant Troilo acted together with Green to incorporate the "second" PONI including its operating agreement containing extensive releases for "previous incorporators" in a conspiracy to obfuscate, however clumsily, Troilo's role as the original incorporator of PONI, in hopes of avoiding his connection to the anticipated $1,000,000 fraudulent wire transfer from the HM LLC to PONI, effectuated one month later. PONI's current status is listed with the Delaware Secretary of State as "void".

32.     Non-party **Cancer Innovations, Inc.,** ("CI") is a Delaware corporation, incorporated on October 15, 2002 with Tropiano listed as registered agent. The ownership shares of CI were listed as security for the "2005 Note" from the HM LLC to defendant RAM Capital. The CI ownership shares securing the 2005 note were valued at $250,000.  September 30, 2006, CI executed a $456,944 note to defendant RAM Capital containing a blank check provision as well as a $200,000 line of credit. An internal RAM Capital Document dated September 30, 2006, valued Vasgene, Delta Pharmaceuticals, and CI at "75 – $250,000 million. Documents that evince the internal organizational structure for multiple "RAM" corporate entities including RAM Capital and RAM Realty Stone Ridge, Delta Pharmaceuticals, ARC and Vasgene, include CI as a start up business operating in corporate form with a majority interest held by "RAM Investment Management, Inc."

33.     Non-party **Victor Battaglia** ("Battaglia"), Non-Party Victor Battaglia (Battaglia) was a Ram Capital employee of various RAM Entity owned or affiliated companies, who acted in an executive capacity for Ram Capital and companies that RAM Entities controlled or were affiliated with often under the direction of defendants Troilo, Molieri, and Kolleda.

34.     Non-party **Patrick Walsh** ("Walsh") is a broker at Merrill Lynch, Bala Cynwd office, who handled the LLC account and many of the accounts associated with the Trust, the unauthorized Jude Mirra Under The Hawk Mountain Trust, the unauthorized Gigi Jordan Trust FBO Jude Mirra and the LLC's holdings.  Walsh was the recipient of many of the fraudulent wire transfers made from the LLC, even though he knew that Jordan was the manager of the LLC and solely empowered to authorize such transfers.

**FACTUAL BACKGROUND**

35.     In 1997 RAM Capital was established. After its creation, RAM Capital became a holding company for many healthcare related companies. RAM Business Holdings was formed in 2003 and upon information and belief held the interests of Ram Capital Group, LLC. RAM Realty Holdings, LLC was formed in January 23, 2003.  In-house attorneys, Troilo and Molieri and accountants, Kolleda, Tropiano, Sadler and Battaglia were involved in the day-to-day operations of multiple RAM controlled or affiliated  businesses. Kovinsky worked in various executive capacities for the RAM companies and its various affiliated businesses.

36.     As early as 1998 and continuing through December of 2009, Jordan placed her full trust in and relied on defendants Troilo, Molieri, Tropiano Kovinsky and Kolleda

in regard to her business, financial and tax matters as her fiduciaries. However, defendants Troilo, Molieri, Tropiano, Kovinsky, and Kolleda did not have power of attorney nor any verbal or written "blank check" authority or any other knowing or voluntary authorization to sign Jordan's name on wire transfers, bank, brokerage, mortgage, loan or line of credit account opening documents or applications, or legal instruments. Defendants Troilo, Tropiano, Kolleda, Kovinsky and Bonventure also handled the HM LLC's accounting, including the preparation of its general ledger.

**The Fraudulent HM Trust Agreement and HM LLC Operating Agreement**

37.     In 2002, Troilo advised Jordan that defendant Eizen, a trusts and estates lawyer, was representing her in establishing asset protection and tax and estate planning services. Jordan has never met or spoken with Eizen. Defendants Troilo, Kolleda, Kovinsky and Walsh also participated in Eizen's provision of these services. In connection with these services, and as set forth in more detail below, Eizen drafted documents and created entities enabling the defendants to misappropriate millions of dollars from the HM LLC.

38.     In or about December 2002, members of the Enterprise fraudulently represented to Jordan that she should create the HM LLC/Trust for the purpose of asset protection and estate and tax planning, when their true purpose was to have access to the monies thereinafter reposed with the HM LLC/Trust. In reliance upon the misrepresentations of the members of the Enterprise, Jordan agreed to form the HM LLC/Trust; Jude Mirra, Jordan's only child, was to be its sole beneficiary.

39.     In or about 2002, defendant Eizen drafted the Hawk Mountain Trust Agreement. In December 2002, the Trust Agreement was executed by Troilo and Kolleda (as Trustees); a signature purporting to be that of Jordan appears on this document as well.  This signature is a forgery and the agreement is thereby a fraudulent document. The signature thereupon was notarized by Virginia Hall, who swore to have witnessed Jordan's signature in Burlington, New Jersey. In fact, Jordan was in Florida on December 12, 2002, the date the Trust Agreement was signed and notarized by Hall. In addition, the defendant witnessed the forging of Jordan's signature on the Trust Agreement. Upon information and belief, the members of the Enterprise created this false and fraudulent document, for the express purpose of carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

40.     When originally formed, the HM Trust did not directly hold any cash and had no assets.  Contemporaneously with the formation of the HM Trust, the HM LLC was also formed with Jordan as sole member and the member who reportedly owned a 100% interest in the HM LLC. The purported execution by Jordan of the Operating Agreement of the HM LLC, hereinafter the "Operating Agreement," was not witnessed, although the document calls for two witnesses to the execution of the document by Jordan individually and as manager. The two signatures on the Operating Agreement purporting to be that of Jordan are forgeries. Upon information and belief, one of more members of the Enterprise created this false and fraudulent document for the express purpose of carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

41.     Although the fraudulent Operating Agreement called for documentation of the distribution of any HM LLC percentage ownership interests to admitted members on an "Exhibit B" to the document, "Exhibit B" exhibit remains blank in the forged documents provided by the defendants. In addition, no document has been produced and upon information and belief, none exists evincing the totality of outstanding shares, units, or other equity interest of the HM LLC.

**The Fraudulent Assignments Of Common Units Of Interest**

42.     A document titled the "Assignment of Common Units of Interest in HM LLC" ["Assignment I"], dated December 12, 2002, indicates that Jordan, as settlor of the trust, assigned and transferred 500 units of "common member interest" in the HM LLC to the HM Trust. The signatures on Assignment I purporting to be that of Jordan are forgeries, and it is thereby a fraudulent document. Defendant Sigloch fraudulently attested to having witnessed Jordan's signature to this document, although Jordan was neither present nor executed the document. Defendant Sigloch worked in Jordan's office for many years and knew full well upon attesting as witness to these forgeries of Jordan's signature that it was not Jordan signing the documents in question.  Upon information and belief, one or more members of the Enterprise created this false and fraudulent document, for the express purpose of carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

43.     An "Assignment of Common Units of Interest in Hawk Mountain LLC" ["Assignment II"] to the Trustees of a "Jude Mirra Trust Under the Hawk Mountain Trust", dated December 12, 2002, states that the other 500 units of "common member

interest" in the HM LLC (of the reported 1000) were sold to Defendants Troilo and

Kolleda as trustees of a purported trust called the "Jude Mirra Trust Under the Hawk

Mountain Trust" although the defendants Troilo and Kolleda have produced no

documentation or agreement evidencing the creation of this trust.  The fraudulent

Assignment II states that the Jude Mirra Trust Under the HM Trust was "established by

me [Jordan] as Settlor" along with the purported Trustees, defendants Troilo and Kolleda.

At no time did Jordan execute, authorize, agree to, or in any other fashion, knowingly

participate or acquiesce in the formation or creation of any such trust. Neither did Jordan

execute, authorize, agree to, or in any other fashion, knowingly participate or acquiesce

in the transfer of membership units of the HM LLC to any such trust. The signature

attributed to Jordan on Assignment II is a forgery. Defendant Sigloch fraudulently

attested to having witnessed Jordan's signature to this document, although Jordan was

neither present for nor actually executed the document. Defendant Sigloch worked in

Jordan's office for many years and knew full well upon attesting as witness to these

forgeries of Jordan's signature that it was not Jordan signing the documents in question.

Upon information and belief, one of more members of the Enterprise created this false

and fraudulent document for the express purpose of carrying out the business of the

Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM

LLC.

**The Fraudulent 2002 Promissory Note And Pledge And Security Agreement**

44.    On December 11, 2002, in connection with the Jude Mirra Trust Under the

Hawk Mountain Trust Assignment, (*dated one day before the forged "Assignment of*

*Common Units of Interest in Hawk Mountain LLC"*) the defendants Troilo and Kolleda

executed a promissory note as "Makers" payable to Jordan as "Payee" in the amount of

$3,060,000 (hereinafter the "2002 Note") and a Pledge and Security Agreement between

Jordan as "Seller," the trustees of the Jude Mirra Trust under The Hawk Mountain Trust

as "Purchaser" and Eizen as escrow agent (hereinafter the "2002 Pledge & Security").

Under the 2002 Pledge & Security, as trustees of the Jude Mirra Trust under the Hawk

Mountain Trust, Defendants Troilo and Kolleda pledged and assigned to Seller a security

interest in the 500 common member units in the HM LLC.  The 2002 Pledge and Security

required that the certificate representing the 500 common member interest in the HM

LLC be delivered to defendant Eizen as escrow agent, who was to hold the certificate as

collateral until the 2002 Note was "fully paid and discharged." The signature attributed to

Jordan on the 2002 Pledge & Security Agreement is a forgery.  Defendant Sigloch

fraudulently attested to having witnessed Jordan's signature to this document, although

Jordan was neither present for nor executed the document.  Defendant Sigloch worked in

Jordan's office for many years and knew full well upon attesting as witness to these

forgeries of Jordan's signature that it was not Jordan signing the documents in question.

Upon information and belief, one of more members of the Enterprise created this false

and fraudulent document, for the express purpose of carrying out the business of the

Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM

LLC.

**The Fraudulent Amendment and Joinder Agreement to the Operating Agreement of the Hawk Mountain LLC.**

45.     In or about December 2002, members of the Enterprise executed An

"Amendment and Joinder Agreement to the Operating Agreement of the Hawk Mountain

LLC" ["Amendment and Joinder"]. This fraudulent document sets forth that Jordan, as

initial member of the HM LLC, agreed that in consideration of the issuance interest of the

HM LLC, defendants Troilo and Kolleda were admitted as "a Member" of the HM LLC.

The signature attributed to Jordan on the Amendment and Joinder is a forgery.

Defendant Sigloch fraudulently attested to having witnessed Jordan's signature to this

document, although Jordan was neither present for nor executed the document.

Defendant Sigloch worked in Jordan's office for many years and knew full well upon

attesting as witness to these forgeries of Jordan's signature that it was not Jordan signing

the documents in question. Upon information and belief, one of more members of the

Enterprise created this false and fraudulent document for the express purpose of carrying

out the business of the Enterprise, to wit, the conversion and misappropriation of funds

belonging to the HM LLC.

46.     In or about December 2002, the defendant Eizen filed a federal gift tax

return on behalf of the HM Trust.  The signature attributed to Jordan on this document is

a forgery.  Upon information and belief, Eizen acting for and through the Enterprise,

created this false and fraudulent document for the express purpose of misappropriating

the assets of the HM LLC.

47.     Pursuant to the 2002 Note, Jordan was to receive an annuity of the accrued

interest on the principal of the loan annually every December until 2006, and then

repayment of the principal and interest on the remaining principal in annual installments.

The Enterprise wrongfully stopped paying these amounts in 2007, and they have refused

to pay them to date, instead converting and misappropriating the funds to their own use.

Indeed, defendant Tropiano specifically directed representatives at Merrill Lynch that the

payments due to Jordan under the 2002 Note would no longer be necessary. As of this writing the defendants Troilo an Kolleda have not paid Jordan over $3,060,000 plus more than $700,000 in interest due to Jordan under the note, converting her rightful assets for the for the express purpose of carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the Jordan.

**The Merrill Lynch Accounts**

48.     On January 16, 2003, account 870-07004 was opened at Merrill Lynch in the name of the HM LLC (the "LLC Account). The principle documents filed with Merrill Lynch were forgeries, as they purported to contain Jordan's signature; she in fact had not executed these documents.  These fraudulent documents included but were not limited to, a "Client Relationship Agreement", a Certification of Authority for HM LLC, a W-9: Request for taxpayer identification, a "Northeast Division of Fed Funds Authorization Form", and a "Margins Risk Disclosure Statement." Upon information and belief, one of more members of the Enterprise created these false and fraudulent documents, for the express purpose of carrying out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.  In reliance upon these fraudulent documents, Merrill lynch a federally insured banking institution, opened these accounts with easy access by members of the Enterprise

49.     Without Jordan's knowledge, consent, or acquiescence, on August 22, 2003, three additional Merrill Lynch accounts were opened with defendants Kolleda and Troilo signing as "Trustees" and are referenced on the forms as "Clients, and "Authorized Account Individuals" for all three accounts.  Account 870-20796 was opened for the

Trust (the "Trust Account"). Account 870-20794 was opened for the "Jude Mirra Trust Under the Hawk Mountain Trust", and Account 870-20795 was opened for, upon information and belief, the Gigi Jordan Trust FBO Jude Mirra account or another unnamed trust account.

**The 2003 Note**

50.     In or about December 4, 2003, members of the Enterprise executed a note (the "2003 Note") allowing defendant RAM Capital to borrow $1,050,000 from the HM LLC. Under the terms of the note, RAM Capital was obligated to pay the 2003 Note "within 30 days of [RAM Capital's] Transfer of VasGene; provided, however, in no event shall the Note be repaid later than sixty (60) days after earlier demand by [the HM LLC]."  "Transfer" is defined as "any sale, transfer, gift or other disposition." The 2003 Note may also be called upon written notice by the HM LLC.  The 2003 Note includes a potentially unlimited "blank check" provision that allows RAM Capital to borrow as "Lender or it's designee may …from time to time designate *in writing*" in addition to the $1,050,000, "such additional amount as may be advanced to or for the benefit of borrower hereunder (collectively [with the $1,050,000] the "principle")". The note also provided for a $500,000 line of credit, the amount of funds lent to be "added to the principal." Defendant Vasgene in this context was additionally defined as all or any portion of the shares of stock of VasGene Therapeutics, Inc. owned by Borrower or any subsequent security, stock or other equity holding, bond or otherwise which mergers, consolidates or exchanges into or with Vasgene Therapeutics, Inc. Upon information and belief such "transfer" did occur but defendant RAM Capital and members of the

Enterprise involved in the transaction never disclosed the transfer, nor paid back the loan

to the HM LLC at any time thereafter.  The 2003 note, which purports to contain Jordan's

signature, is a forgery. Upon information and belief, one of more members of the

Enterprise created this false and fraudulent document for the express purpose of carrying

out the business of the Enterprise, to wit, the conversion and misappropriation of funds

belonging to the HM LLC.

**The 2003-2004 Fraudulent Wire Transfers**

51.     Between December 4, 2003 (the date of the 2003 Note) and March 12,

2004, members of the Enterprise initiated two wire transfers from the HM LLC Account

at Merrill Lynch to defendant RAM Capital.  On or about December 5, 2003,

$1,050,000.00 was wire-transferred to defendant RAM Capital. On or about March 12,

2004, $250,000 was wire-transferred to defendant RAM Capital..  All of the wire transfer

authorizations for these fraudulent transmittals, purporting to contain Jordan's signature,

were forgeries.  Moreover Jordan, in her capacity as manager for the HM LLC, never

authorized the transfers, nor did she sign or authorize the execution of her signature on

any of the fraudulent transfers. Upon information and belief the foregoing documents

were fraudulently prepared and executed by one or more members of the Enterprise.  As

such, these unauthorized monetary transfers were individually and jointly acts of wire

fraud carrying out the business of the Enterprise, to wit, the conversion and

misappropriation of funds belonging to the HM LLC.

**The Fraudulent Consent To Lend Funds To RAM Capital**

52.     In or about March 8, 2004, members of the Enterprise fraudulently executed a document entitled "Consent of The Manager To Lend Funds To Ram Capital Group, LLC. (the "2004 Consent").  On its face, this document authorized an additional draw on the 2003 Note in the amount of $250,000  "as requested by Mark A. Kovinsky, CIO of RAM on March 8, 2004." Jordan was not sent the March 8, 2004 "Consent," or any other written request to borrow funds under the terms of the note and the signature, purporting to be Jordan's, is a forgery.  Upon information and belief the foregoing document was fraudulently prepared and executed by one or more members of the Enterprise.  As such, this document represent an act of wire fraud, mail fraud and financial institution fraud, designed to carry out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

**The 2005 Note**

53.     The ownership shares of defendant RAM Realty collateralized a note dated, April 1, 2005 (the "2005 Note") securing a loan from the HM LLC to defendant RAM Capital. Under the terms of the 2005 note, the HM LLC extended a loan in the principle amount of $100,000 to defendant RAM Capital.

54.     The 2005 Note included an unlimited blank check provision (the "blank check provision"). Such a provision is found repeatedly in similar indebtedness instruments to follow. The blank check provision provided unlimited discretion for defendant RAM Capital to borrow as "Lender or it's designee may …from time to time designate ***in writing***" in addition to the $100,000 principal. The note also provides for an

additional $6,000,000 line of credit, the amount of funds actually loaned to be added to the principle. A schedule to the 2005 note (the "2005 Schedule"), collateralized the 2005 Note with the ownership shares of ten RAM and RAM affiliated companies valued in excess of $73,000,000, companies in which the defendants Troilo, Kolleda, Molieri, Kovinsky, Stewart, and Tropiano, worked in an executive capacity, held positions as officers and/or in which they held an ownership interest. These companies listed in were represented in Schedule 1 to the 2005 Note to have values ranging from $100,000 to $25,000,000.  (2005 Note, Schedule 1). Under the provision of the 2005 Note, in the event of maturity, default or when called, the HM LLC could elect at its discretion to take repayment in cash or stock in one or more of the companies set forth in Schedule 1 to the 2005 Note. The real estate and companies listed on Schedule 1 to the 2005 Note are cumulatively valued at over $70,000,000.

55.     Moreover, the 2005 Note provides that should the HM LLC elect to be repaid in stock, the percentage of interest to be acquired will be "based on the agreed upon company fair market valuation set forth" on the schedule of companies securing the note. The 2005 note further provides that until such time as the note is paid in full, RAM Capital agrees not to transfer any of the securities listed as security to the note without the prior written approval of the HM LLC, and, that if RAM Capital fails to give timely notice, it agreed to repay such amount in cash.   The RAM Realty ownership shares securing the 2005 note in the 2005 Schedule were valued at $7,000,000.

56.     Plaintiff Jordan, as the Manager of the HM LLC, never received any such requests to borrow funds as required under the terms of the 2005 Note.

**The 2005-2006 Fraudulent Transfers**

57.     After the 2005 Note was executed, a total of $5,906,933.11 was fraudulently transferred from the LLC Account at Merrill Lynch using wire transfers authorizations forged with Jordan's signature, without her knowledge or receipt of any written reques**t**.  In or about April 13, 2005, $100,000 was wire-transferred to defendant RAM Realty Holdings.  In or about June 16, 2005,  $100,000 was wire-transferred to defendant RAM Capital.  In or about June 30, 2005, $250,000 was wire-transferred to defendant RAM Capital Group.  In or about July 5, 2005,  $400,000 was wire-transferred to defendant RAM Capital Group.  In or about August 8, 2005, $1,000,000 was wire-transferred to Physician Oncology Network, Inc.  Upon information and belief, defendant Green colluded with defendant Troilo to cover up this fraudulent wire transfer from the LLC account, faxed from the offices of defendant RAM Capital.  In or about August 31, 2005, $400,000 was wire-transferred to defendant RAM Capital Group.  In or about September 15, 2005, $200,000 was wire-transferred to defendant RAM Capital Group. In or about May 19, 2006, $2,644,634 was transferred to defendant VasGene Therapeutics, Inc. Upon information and belief the fraudulent wire transfer authorizations were fraudulently prepared and executed by one or more members of the Enterprise.  As such, these unauthorized monetary transfers were individually and cumulatively acts of wire fraud and financial institution fraud, designed to carry out the business of the Enterprise, to wit, the conversion and misappropriation of funds belonging to the HM LLC.

58.     In essence, these fraudulent transfers were carried out in furtherance of the goals of the Enterprise, to divest the HM LLC of its rightfully owned assets, and to

distribute those monies to RAM Capital and its satellite subsidiaries.  The financial incest between these companies during this period evinces the Enterprise's scheme and purpose. On September 30 2006, defendant Pridecare executed a $1,865,971.48 note to defendant RAM Capital containing a blank check provision as well as a $250,000 line of credit. On September 30 2006 as well, defendant Stone Ridge Enterprises LLC tendered a $3,466,640 note to defendant RAM Capital with a blank check provision, as well as a $300,000 line of credit (Defendant RAM Realty Holdings LLC, held a 100% interest in Stone Ridge Enterprises). Also on September 30, 2006, ARC executed a $1,489,205 note to defendant RAM Capital containing a blank check provision and a $250,000 line of credit.  On September 30, 2006, CI executed a $12,865 note to defendant RAM Capital containing a blank check provision as well as a $200,000 line of credit. Finally, on September 30, 2006, Atlas executed a $1,704,077 note to defendant RAM Capital containing a blank check provision as well as a $250,000 line of credit.

**The 2006-2009 Changes In The Registered Agent For The HM LLC**

59.     On February 8, 2006, a Certificate of Amendment for the HM LLC filed with the Delaware Secretary of State by defendant Molieri, changed the registered agent of the HM LLC from Corporation Service Company to James Kuo. Upon information and belief, members of the Enterprise forged Jordan's signature on this document. On February 12, 2009, defendant B. Kuo, as executrix of J. Kuo's estate, executed a power of attorney authorizing defendant Molieri to exercise business decisions on behalf of J. Kuo, only with regard to J. Kuo's capacity as registered agent for corporations or LLC's in Delaware. On June 3rd of 2009, defendant Molieri filed six affidavits with the

Delaware Secretary of State, changing the registered agent for the HM LLC, RAM Capital, and four other related LLC's from J. Kuo to defendant Tropiano. Upon information and belief, Troilo forged Jordan's signature on the affidavit as authorized person for the change of registered agent for the LLC.

**Diversion of the Ownership Interests of the HM LLC**

60.     The 2007 tax returns prepared for the HM LLC, together with form 8308, state that the Hawk Mountain Trust's 50% partnership interest in the HM LLC was transferred to a "Gigi Jordan Trust FBO Jude Mirra" c/o Joseph Troilo, leaving two partners in the HM LLC at years end, a "Gigi Trust for the benefit of Jude Mirra" and the Jude Mirra Trust Under the Hawk Mountain Trust.  Consistent with 2007 reporting, the 2008 HM LLC tax returns state that the remaining partners of the HM LLC were the "Gigi Jordan Trust FBO Jude Mirra" and the "Jude Mirra Trust Under the Hawk Mountain Trust," with each of these trusts owning a 50% partnership interest in the HM LLC.  The plaintiff Jordan did not consent or authorize the formation of any such trust, nor did she consent or participate in the transfer of any partnership interest to any other trust.  Any documents purporting to contain Jordan's signature authorizing or consenting to such transfers or transactions are a forgery, and constitute additional acts of mail fraud, wire fraud and financial institution fraud.

61.     In 2007 and 2008, tax refund checks were issued to the trustees of the Gigi Jordan Trust FBO Jude Mirra. The 2007 check is dated March 3, 2009, and it is in the amount of $66,851.95.  The 2008 check is dated March 2, 2010, and it is in the amount of $56,296.27.  These checks were mailed to Troilo; they were not cashed; and they were not provided to Jordan until late 2010.  The checks are void after one year.

**The Forged 2009 Release and the Merger of the and Jude Mirra Trusts**

62.     Between August and November 2009, defendant Troilo emailed Jordan no less than three times seeking her authentic signature as settlor on a document titled "Receipt, Release, Indemnification and Merger Agreement "(the "Forged 2009 Release"). Troilo never mentioned the purpose of the document or that the document contained a broad release for any and all actions taken by the "Trustees" in any capacity.

63.     In or about November 19, 2009, one or more members of the Enterprise executed the 2009 release. The signature purporting to be Jordan's on this document is a forgery. The document was forged in Pennsylvania and illegally notarized by defendant Stewart, a RAM employee who worked under Troilo and Kolleda's direction.  Defendant B. Kuo fraudulently witnessed Jordan's purported signature.  Stewart and Kuo attested that Jordan was present in Pennsylvania and had executed the document before them, while time stamped documents show Jordan was in New York for the entire day.  Upon information and belief, one or more members of the Enterprise forged Jordan's signature for the express purpose of furthering the goals of the Enterprise, to wit, the misappropriation and conversion of the assets of the HM LLC and the beneficiaries of the HM Trust.

64.     The background section of the Forged 2009 Release recites that "[u]pon formation of the Jude Mirra Trust, the Jude Mirra Trust purchased . . . 500 units of common member interests in [the LLC]. . . ."  However, as set forth above, Schedule A to the Trust Agreement states that those same 500 units of the HM LLC were "sold to [**the HM Trust**]."  (the Trust Agreement Schedule A).  The Agreement section of the Forged

2009 Release further recites that the Jude Mirra Trust is merged with and into the Hawk

Mountain Trust for Jude Mirra (Forged 2009 Release at Agreement § E) -- **not the HM**

**Trust**.

65**.**	The Forged 2009 Release also recites that all annuity payments had been

made to Jordan, but did not address the "$612,000 together with interest at the interest

rate on the [then] unpaid balance. These payments were to commence on December 12,

2007 and continue on the next four anniversaries thereof until December 12, 2011.

Defendants Troilo and Kolleda knowingly omitted this obligation and their default in

meeting the payment schedule set forth in the Forged 2009 Release. The Forged 2009

Release also purports to release the Trustees, defendants Troilo and Kolleda, from all

liability arising out of their administration of the Trust, causes a waiver of audit of the

Trust, and states that Jordan "consents to, approves, ratifies and confirms all of

defendants Troilo and Kolleda' actions, including but not limited to, the division of the

remaining assets."  The document also purports to have retroactive effectiveness, with the

document taking effect on January 1, 2009.

**The 2010 Fraudulent Transfer**

66.	On February 5, 2010, Jordan authorized a transfer of $125,000 to Ibary

Assets LLC (a company owned by Jordan), but the funds were fraudulently transferred

from the HM LLC Account, not from Jordan's personal Merrill Lynch account (account #

870-21268), which had been used for these transfers in the past.  The $125,000 was

transferred from the HM LLC Account to an account opened by Kolleda in December of

2009.  This latter account was opened in the name of Jordan's sole member LLC without

her knowledge or authority after defendant Kolleda closed her previous account without her knowledge or authority. The original account number on the wire transfer was "whited out" and replaced with the HM LLC Account number.  Jordan did not authorize the wire of funds from the HM LLC Account.

67.     That day, on February 5, 2010, Jude Mirra, Jordan's only child and beneficiary of the Trust, died under tragic circumstances.  As a result of Jude's death, Kim Jordan, Jordan's mother became the beneficiary of the Trust.


**The Enterprise Seeks A Second Fraudulent Release**


68.     In or about April 2010, shortly after Jude's death, defendant Eizen began to correspond with plaintiff Jordan's counsel, Mark Petersen, asserting that he represented the Trustees of the HM Trust, the defendants Troilo and Kolleda. Eizen reported to Petersen that upon the passing of Jordan's son Jude Mirra, the HM Trust had ended and the assets should be distributed to Kim Jordan as the beneficiary in accordance with the rules of intestacy. Shortly after Eizen communicated this information to Petersen, Jordan retained Carlyn S. McCaffrey, a New York trust and estates attorney to advise her in this regard. Upon advice and assistance of her attorney, as manager of the HM LLC, Jordan lawfully moved the HM LLC assets into an escrow account at Merrill Lynch *in the name of the HM LLC.*

69.     On or about April 20, 2010, Eizen telephoned Patrick Walsh, Jordan's broker at Merrill Lynch ("ML") in regard to the HM LLC account.  After Eizen 's call, Walsh contacted Petersen, and Petersen directed Walsh to relate any of Eizen's additional inquiries regarding the HM LLC account directly to Petersen.

70.     On April 21, 2010, Peterson emailed defendant Eizen to that effect, stating "any inquiries be directed to me, rather than to Pat." Petersen further inquired as to whether Eizen now represented defendants Troilo and Kolleda as he understood that Eizen represented plaintiff Jordan. Eizen did not respond. Instead, two days later on April 23, 2010, defendant Eizen relayed to Walsh by letter that he was contacting Walsh "in his capacity as counsel to the Trustees."  Eizen asserted that, as Walsh was aware, Eizen had tried to call him but had received Walsh's e-mail in response indicating that he had been instructed by Petersen not to speak with him.  Eizen proceeded to intentionally and fraudulently mis-state the facts of the monetary transfer by Jordan and instructed Walsh that his "[c]lients **had been informed**" that a transfer of approximately $7,000,000 in funds had been illegally accomplished without the "knowledge joinder or consent of the Trustees" and was "unlawful." Eizen demanded that the monies be "restore[d] to the Trust fund immediately." However, as Eizen well knew having drafted the HM LLC and HM Trust documents, the funds in the ML account were the exclusive property of the HM LLC and Jordan was solely authorized to manage them, *not* the HM Trust. There was no "Trust fund" or any illegality in Jordan's instructions regarding the HM LLC's funds.  Walsh, who had been Jordan's broker for many years and was familiar with and in possession of the Operating Agreement of the HM LLC (as a required document by Merrill Lynch for opening business accounts), and also knew well that Jordan as manager was the only individual authorized to make decisions regarding the management of the funds therein pursuant to the HM LLC Operating Agreement. In fact, the defendants Troilo, Kolleda, ands Eizen's interference and misleading statements to Walsh in attempt to misappropriate funds were acts of mail fraud, wire fraud and bank fraud calculated to

accomplish the ends of the Enterprise, to wit, under false representations, to wrongfully gain control over the assets of the HM LLC.

71.     On May 17, 2010, Jordan's attorney Carlyn McCaffrey received a letter from defendant Eizen, proposing a "Receipt, Release, Indemnification, Waiver of Accounting and Trust Termination Agreement"  (the "2010 Proposed Release."). Defendant Eizen sought a waiver of an accounting for the HM Trust.  This proposed release also sought to release the Defendants Troilo and Kolleda for ***"any act of willful misconduct, negligence or dishonesty…"*** The Proposed Release further provided that Jordan and Kim Jordan approve, ratify and confirm all of the Defendants Troilo and Kolleda's actions, and that they release the defendants Troilo and Kolleda for all claims, including "any and every claim, demand, action and cause of action, account, reckoning and liability of every name and nature…."   At the time of the transmission of this letter, the defendants Troilo, Kolleda, and Eizen were fully aware that they had committed mail fraud, wire fraud and financial institution fraud between 2002 and the present.  This letter and proposed release were efforts by members of the Enterprise to cover up its fraud with regard to the original Trust Agreement, and the 2009 Release, to insulate themselves from civil liability for their criminal activity, and to protect the assets of the Enterprise, RAM Capital and its satellite subsidiaries (many of which secured the 2005 Note) to the HM LLC recipients of the fraudulent wire transfers from the HM LLC.  As such, the transmission of the letter was an act of mail fraud, carried out by members of the Enterprise in furtherance of the business of the Enterprise, to wit, the misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.

**The Defendants Troilo and Kolleda Fraudulently File a Certificate of Cancellation for the HM LLC and Tender a Fraudulent and Extortionate Settlement offer**

72.     On May 24, 2010, the earlier efforts to extort the above release having failed, defendant Eizen wrote to McCaffrey and stated that the Trustees "are proceeding to terminate the [HM] LLC and shall instruct that all assets of the [HM] LLC *be retitled in the name of the Trustees of the Trust*, pending a resolution of the Trust." .

73.     In that same letter, the defendant Eizen advanced a "settlement offer" that "if not accepted in all respects" would expire at noon on May 26, 2010.  The "settlement offer" further required Jordan to sign the same indemnification and broad release attached to Eizen's May 17, 2010 correspondence that absolved defendants Troilo and Kolleda of any responsibility for **"acts of willful misconduct, negligence or dishonesty**.*"*  At the time of the tender of this letter, the defendant Eizen was aware that he and other members of the Enterprise had committed mail fraud, wire fraud and financial institution fraud between 2002 and the present.  This letter and proposed release were efforts by members of the Enterprise to cover up its fraud with regard to the original Trust Agreement(s), and the Forged 2009 Release, to insulate themselves from civil liability for their criminal activity the assets of the Enterprise, RAM Capital and its satellite subsidiaries, recipients of the fraudulent wire transfers from the HM LLC.    As such, the transmission of the letter was an act of mail fraud, carried out by members of the Enterprise in furtherance of the business of the Enterprise, to wit, the misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.

74.     The "settlement offer" further stipulated, *inter alia,* that "Gigi Jordan shall pay to the Trust the $7,875.000, plus accrued interest since March 2008, due to

the **trust** on account of the business separation agreement and related matters."  After

McCaffrey challenged Eizen's assertion, explaining that RAM Capital was not a party

to the agreement referenced, McCaffrey asked Eizen to provide the underlying

documentation supporting his claim regarding Jordan's purported $8 million dollar

debt in *seven different written requests*. Eizen refused to respond to this question.

Indeed, Eizen ceased making any representations as to the purported $8 million

coercively pressed for in his May 24, 2010 letter.

75.     Defendant Eizen intentionally and fraudulently misrepresented that

plaintiff Jordan owed the HM Trust approximately $8,000,000.00, fully knowing and

aware that no such debt actually existed.  Defendant Eizen was fully aware that the

debt was secured by available assets of the defendant RAM Capital and its satellite

subsidiaries as shown in the 2005 Schedule to the 2005 Note.  Eizen's fraudulent

concealment of the 2005 note, was another effort to prevent discovery of the

enterprise's fraud.  Had Eizen actually provided the 2005 Note it would have revealed

that Jordan *did not* owe the money to RAM Capital, but instead, Jordan had

guaranteed that she would pay back the loan secured by the note if RAM and the

Companies and real estate securing the note in the 2005 Schedule were unable to pay

back the HM Trust/HM/LLC.  The 2005 Schedule to the 2005 Note committed over

$70 million in RAM related company stock or real estate to secure the note for

payment. The revelation of the 2005 Schedule would have pre-empted any attempt by

the Enterprise to claim that RAM Capital was devoid of assets to pay the debt.  As

such, the transmission of the letter was an act of mail fraud, carried out by members of

the Enterprise in furtherance of the business of the Enterprise, to wit, the

misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.

76.    On May 28, 2010, defendants Troilo and Kolleda aided by defendant Eizen, who faxed the papers to the Delaware Secretary of State, unlawfully filed a Certificate of Cancellation for the HM LLC with the Delaware Secretary of State. Under the Operating Agreement, only Jordan (or a court by entry of a decree ) had the authority to dissolve the HM LLC; the defendants Troilo and Kolleda had no power or authority to dissolve the HM LLC.  In filing this fraudulent document, defendant Troilo intentionally misrepresented on the certificate of cancellation filed with the Delaware Secretary of State that he was "an authorized person," entitled to dissolve the HM LLC, when he knew he had no such authority.  As such, the filing of the letter was an act of mail fraud and wire fraud, carried out by members of the Enterprise in furtherance of the business of the Enterprise, to wit, the misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.

77.    On June 22, 2010, the defendants Troilo and Kolleda wrote to Patrick Walsh at Merrill Lynch and stated that they had recently filed a Certificate of Cancellation "terminating the existence" of the HM LLC, and as a result, the HM Trust was "the sole owner of all of the assets held by [the LLC]." The defendants Troilo and Kolleda also told Walsh to "immediately re-title the accounts currently held by [the LLC] in the name of the Trustees." Defendants Troilo and Kolleda followed up with a June 23, 2010 letter to Walsh telling him that he can "no longer honor any future requests by anyone on behalf of [the LLC].  That entity no longer has formal existence, and no one, including Gigi Jordan or any of her advisors has any authority to act on its behalf."

78.     The defendants Troilo, Kolleda and Eizen were aware that they had no authority to "cancel" the HM LLC or to direct Walsh as set forth above.  As such these acts were mail and wire fraud, carried out by members of the Enterprise in furtherance of the business of the Enterprise, to wit, the misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.[8]

79.     On or about September 25, 2010, Carlyn S. McCaffrey, Esq., on behalf of the plaintiffs, contacted Eizen's law office and requested the documents upon which the defendants Troilo and Kolleda relied in their claims for various forms of relief relative to the HM Trust.

80.     On or about October 20, 2010, at the request of McCaffrey, defendant Eizen transmitted by mail many of the forged and fraudulent documents referenced above.  The defendants Eizen, Kolleda and Troilo, knew that many of the documents being transmitted to McCaffrey were forged and/or fraudulent, and exchanged them for the purpose of inducing the plaintiff's to alter their position, particularly in efforts to obtain broad releases for defendants Troilo and Kolleda. As such, the transmission of the letter was an act of mail fraud, carried out by members of the Enterprise in furtherance of the business of the Enterprise, to wit, the misappropriation and conversion of the funds of the HM LLC and the beneficiaries of the HM Trust.

81.     The forgeries and fraud complained of above were not discovered by Jordan until not earlier than 2010.  In addition, as set forth above, many of the acts of fraud themselves were designed and intended to fraudulently conceal the predicate acts

---

[8]  After repeated demands by McCaffrey, on July 15, 2010, the defendants Troilo and Kolleda filed a certificate of Correction that withdrew the Certificate of Cancellation.

engaged in by the Enterprise between 2002 and 2010, thereby equitably tolling the

Statute of Limitations.


**AS AND FOR A FIRST SEPARATE AND COMPLETE
CAUSE OF ACTION**
(Violation of Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(c))

Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through

"81" as if fully set forth herein.

82.     The association in fact set forth above is an enterprise engaged in and

whose activities affect interstate commerce.

83.     The Defendants agreed to and did conduct and participate in the conduct

of the enterprise's affairs through a pattern of racketeering activity and for the unlawful

purpose of intentionally defrauding Plaintiffs.

84.     Pursuant to and in furtherance of their fraudulent scheme, Defendant(s)

committed multiple related predicate acts of racketeering, to wit:


a.     In or about 2002, members of the Enterprise fraudulently induced Jordan
to participate in the creation of the HM Trust by misrepresenting that the purpose for the
establishment of the HM Trust and the HM LLC was for asset protection and estate and
tax planning; this act constituted mail fraud and wire fraud.

b.     In or about December 2002 members of the Enterprise forged Jordan's
signature on the Hawk Mountain Trust Agreement; this act constituted mail fraud, wire
fraud and bank fraud.

c.     In or about December 2002 members of the Enterprise forged Jordan's
signature on the Hawk LLC Operating Agreement; this act constituted mail fraud, wire
fraud and bank fraud.

d.     In or about December 2002, members of the Enterprise forged Jordan's
signature on the Amendment and Joinder Agreement to the Operating Agreement of
Hawk Mountain LLC;" this act constituted mail fraud, wire fraud and bank fraud.

e.      In or about December 2002, members of the Enterprise forged Jordan's signature on an "Assignment of Common Units of Interest in HM LLC;" this act constituted mail fraud, wire fraud and bank fraud.

f.      In or about December 2002, members of the Enterprise forged Jordan's signature on a second "Assignment of Common Units of Interest in HM LLC;" this act constituted mail fraud, wire fraud and bank fraud.

g.      In or about December 2002, members of the Enterprise executed a fraudulent Promissory Note, which was the consideration for a transfer of 500 Common Units of Interest, to which Jordan had never agreed; this act constituted mail fraud and wire fraud.

h.      In or about December 2002, members of the Enterprise forged Jordan's signature on a Pledge and Security Agreement which was related to the fraudulent transfer of 500 Common Units of Interest, to which Jordan had never agreed; this act constituted mail fraud and wire fraud.

i.      In or about December 2002, members of the Enterprise fraudulently transferred 500 Common Units of Interest from the LLC to the Jude Mirra Under Hawk Mountain Trust, without Jordan's permission, consent or authorization; this act constituted mail fraud and wire fraud.

j.      In or about January 2003, members of the Enterprise forged Jordan's signature on numerous formal and official documents necessary for the opening of an account in the name of the HM LLC at Merrill Lynch; this act constituted mail fraud, wire fraud and bank fraud.

k.      In or about December 2003, members of the Enterprise forged Jordan's signature on a note evincing a loan of $1,050,000.00 to defendant RAM Capital from HM LLC, a loan which was made without Jordan's permission, knowledge, consent or authorization; this act constituted mail fraud, wire fraud and bank fraud.

l.      In or about December 5, 2003, members of the Enterprise fraudulently transferred $1,050,000.00 transferred from HM LLC to RAM by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

m.     On or about March 8, 2004, members of the Enterprise forged Jordan's signature upon, and fraudulently executed a document entitled "Consent of The Manager To Lend Funds To Ram Capital Group, LLC;" this act constituted mail fraud and wire fraud.

n.      In or about March 12, 2004, members of the Enterprise fraudulently transferred $400,000 to RAM Capital Group from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

o.    In or about March 12, 2004, members of the Enterprise fraudulently transferred $250,000 to RAM Capital from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

p.    In or about May 7, 2004, members of the Enterprise forged Jordan's signature on a document entitled Consent of The Manager To Lend Funds To Ram Capital Group, LLC," which authorized an additional $250,000 draw on the fraudulent 2003 Note; this act constituted mail fraud and wire fraud.

q.    In or about April 13, 2005, members of the Enterprise fraudulently transferred $100,000 to RAM Realty Holdings from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

r.    In or about June 16, 2005, members of the Enterprise fraudulently transferred $100,000 to RAM Capital Group from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

s.    In or about June 30, 2005, members of the Enterprise fraudulently transferred $250,000 to RAM Capital Group from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

t.    In or about August 8, 2005, members of the Enterprise fraudulently transferred $1,000,000 to Physician Oncology Network by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

u.    In or about August 31, 2005, members of the Enterprise fraudulently transferred $400,000 to RAM Capital Group from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

v.    In or about September 15, 2005, members of the Enterprise fraudulently transferred $200,000 to RAM Capital Group from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

w.    In or about March 19, 2006, members of the Enterprise fraudulently transferred $2,644,634 to VasGene Therapeutics from HM LLC by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

x.    In or about December 2007, members of the Enterprise fraudulently transferred 500 Common Units of Interest from the HM LLC to the Gigi Jordan FBO Jude Mirra Trust, without Jordan's knowledge, permission, consent or authorization; this act constituted mail fraud and wire fraud.

y.    In or about November 19, 2009, members of the Enterprise forged Jordan's signature on a document entitled "Receipt, Release, Indemnification and Merger

Agreement," which purported to release defendants Tropiano and Kolleda for their actions as Trustees of the HM Trust; this act constituted mail fraud and wire fraud.

z.      In or about February 5, 2010, members of the Enterprise fraudulently transferred $125,000 from the HM LLC Account to an account opened by defendant Kolleda on February 5, 2010, by utilizing a forged wire transfer authorization; this act constituted mail fraud, wire fraud and bank fraud.

aa.     In or about May 2010, the members of the Enterprise made knowingly false statements to representatives of Merrill Lynch regarding Jordan's status and authority to direct the funds of the HM LLC, to induce Merrill Lynch to divest Jordan of control and access; this act constituted mail fraud, wire fraud and bank fraud.

bb.     In or about May 2010, the members of the Enterprise knowingly and intentionally withheld information that would have revealed the assets of RAM Capital and its satellite subsidiaries and related entities and their liability to the HM LCC, with the intent to induce Plaintiffs to pay their $8,000,000.00 debt to the LLC; this act constituted mail fraud and wire fraud.

cc.     In or about May 2010, the Members of the Enterprise made fraudulent misrepresentations in a letter to Carlyn McCaffrey, knowing them to be false, in an effort to induce Plaintiffs to furnish a release for "any act of willful misconduct, negligence or dishonesty" on the part of defendants Kolleda and Tropiano; this act constituted mail fraud and wire fraud.

dd.     In or about May 2010, the members of the Enterprise made fraudulent misrepresentations in a letter to Carly McCaffrey, knowing them to be false, in an effort to induce Plaintiffs to alter their position relative to their proprietary interest in the assets of the HM LLC; this act constituted mail fraud and wire fraud..

85.     The acts set forth above constitute a pattern of racketeering activity

pursuant to 18 U.S.C. § 1961(5).

86.     The Defendants have directly and indirectly conducted and participated in

the conduct of the enterprise's affairs through the pattern of racketeering and activity

described above, in violation of 18 U.S.C. § 1962(c).

87.     As a direct and proximate result of the Defendants' racketeering activities

and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and

property in that the amount of $14,354,855.96, plus interest calculated thereupon that was

converted and misappropriated from the plaintiffs.

88.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against

the Defendants as follows:

A.     At least $14,354,855.96 in damages for the monies misappropriated
converted and stolen from the HM LLC by the defendants;

B.     Other damages directly related to the Enterprise's misconduct, including
attorney and other professional fees incurred prior to this litigation;

C.     Treble damages pursuant to Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1964(c);

D.     Applicable interest on the foregoing amount;

E.     Cost of suit and attorneys' fees pursuant to Racketeer Influenced and
Corrupt Organizations Act, 18 U.S.C. § 1964(c); and

F.     Such other and further relief as the Court deems just and proper.


## AS AND FOR A SECOND SEPARATE AND COMPLETE
## CAUSE OF ACTION
(Violation of Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(a))


89.     Plaintiffs repeat and reallege the allegations contained in paragraphs "1"

through "88" as if fully set forth herein.

90.      The association-in-fact set forth above is an enterprise engaged in and

whose activities affect interstate commerce.

91.     The Defendants used and invested income that was derived from a pattern

of racketeering activity in an interstate enterprise.

92.     The Defendants looted and plundered the assets of the HM LLC and used and distributed said monies to RAM Capital its satellite subsidiaries and related companies, of which the individual defendants were principals, officers, owners, shareholders, agents, or employees, through a series of loans, notes and other financial investments.

93.     The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

94.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that property in that the amount of $14,354,855.96, plus interest calculated thereupon was converted and misappropriated from the plaintiffs.

95.     **WHEREFORE**, Plaintiff requests that this Court enter judgment against the Defendants as follows:

A.      At least $14,354,855.96 in damages for the monies misappropriated converted and stolen from the HM LLC by the defendants;

B.      Other damages directly related to the Enterprise's misconduct, including attorney and other professional fees incurred prior to this litigation;

C.      Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

D.      Applicable interest on the foregoing amount;

E.      Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and

F.      Such other and further relief as the Court deems just and proper.

### AS AND FOR A THIRD SEPARATE AND
### COMPLETE CAUSE OF ACTION
(Violation of Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(B))

96.     Plaintiffs repeat and reallege the allegations contained in paragraphs "1"

through "95" as if fully set forth herein.

97.      The association-in-fact set forth above is an enterprise engaged in and

whose activities affect interstate commerce.

98.     The Defendants acquired and maintained interests in and control of the

enterprise through a pattern of racketeering activity.

99.     The Defendants looted and plundered the assets of the HM LLC and

thereafter acquired and maintained control of RAM Capital its satellite subsidiaries and

related companies, of which the individual defendants were principals, officers, owners,

shareholders, agents, or employees, through a series of loans, notes and other financial

investments.

100.     The racketeering activity listed above constitutes a pattern of racketeering

activity pursuant to 18 U.S.C. § 1961(5).

101.     The Defendants have directly and indirectly acquired and maintained

interests in and control of the enterprise through the pattern of racketeering activity

described above, in violation of 18 U.S.C. § 1962(b).

102.     As a direct and proximate result of the Defendants' racketeering activities

and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and

property in that property in that the amount of $14,354,855.96, plus interest calculated

thereupon was converted and misappropriated from the plaintiffs.

103.    **WHEREFORE**, Plaintiff requests that this Court enter judgment against

the Defendants as follows:

A.    At least $14,354,855.96 in damages for the monies misappropriated converted and stolen from the HM LLC by the defendants;

B.    Other damages directly related to the Enterprise's misconduct, including attorney and other professional fees incurred prior to this litigation;

C.    Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

D.    Applicable interest on the foregoing amount;

E.    Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and

F.    Such other and further relief as the Court deems just and proper.


### AS AND FOR A FOURTH SEPARATE AND COMPLETE CAUSE OF ACTION
(Violation of Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(d))


104.    Plaintiffs repeat and reallege the allegations contained in paragraphs "1"

through "103" as if fully set forth herein.

105.    As set forth above, the Defendants agreed and conspired to violate 18

U.S.C. §§ 1962(a) and (c).

106.  The Defendants have intentionally conspired and agreed to directly and

indirectly use or invest income that is derived from a pattern of racketeering activity in an

interstate enterprise, acquire or maintain interests in the enterprise through a pattern of

racketeering activity, and conduct and participate in the conduct of the affairs of the

enterprise through a pattern of racketeering activity. The Defendants knew that their

predicate acts were part of a pattern of racketeering activity and agreed to the commission

of those acts to further the schemes described above. Such conduct constitutes a

conspiracy to violate 18 U.S.C. §§ 1962(a), (b) and (c), in violation of 18 U.S.C. §

1962(d).

107.    As a direct and proximate result of the Defendants' conspiracy, the overt

acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d),

Plaintiffs have been injured in their business and property in that the amount of

$14,354,855.96, plus interest to be calculated thereupon was converted and

misappropriated from the plaintiffs.

108.    **WHEREFORE**, Plaintiff requests that this Court enter judgment against

the Defendants as follows:

A.    At least $14,354,855.96 in damages for the monies misappropriated converted
and stolen from the HM LLC by the defendants;

B.    Other damages directly related to the Enterprise's misconduct, including attorney
and other professional fees incurred prior to this litigation;

C.    Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1964(c);

D.    Applicable interest on the foregoing amount;

E.    Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1964(c); and

F.    Such other and further relief as the Court deems just and proper.


Dated:          Wilmington, Delaware
                December 23, 2013

Ferry, Joseph & Pearce, P.A.

/s/Rick S. Miller
David J. Ferry, Jr. (#2149)
Rick S. Miller (#3418)
824 N. Market Street, Suite 1000
P.O. Box 1351
Wilmington, DE 19899-1351
(302) 575-1555
dferry@ferryjoseph.com
rmiller@ferryjoseph.com

Of Counsel:

Allan L. Brenner, Esq.
536 West Penn Street- 2nd floor
Long Beach, New York 11561
(516) 897-6145
brennerlawlb@gmail.com

Attorneys for Plaintiffs