## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE HAWK MOUNTAIN LLC, GIGI<br>JORDAN, MICHELLE E. MITCHELL,<br>and KIMBERLY JORDAN, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 13-2083-SLR-SRF |
| RAYMOND A. MIRRA, JR., RAM<br>CAPITAL GROUP, LLC D/B/A RAM<br>CONSULTING GROUP, LLC, RAM<br>CAPITAL II, LLC, RAM REALTY<br>HOLDINGS, LLC, JOSEPH A. TROLIO,<br>JR., JOSEPH T. MOLIERI, BRUCE<br>KOLLEDA, MARK A. KOVINSKY,<br>JOSEPH J. TROPIANO, JR., LLC,<br>BERNARD EIZEN, PATRICK J. WALSH,<br>DANIELLE STEWART, RENEE M.<br>SIGLOCH, FREDERICK FORTE,<br>VIRGINIA L. HALL, BARI KUO, and<br>SHELLY DEMORA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this action brought under the Racketeer Influenced and

Corrupt Organizations Act ("RICO") are the following motions: (1) the motion to dismiss for

failure to state a claim upon which relief can be granted of defendant Bernard Eizen ("Eizen")

(D.I. 62); (2) the motion to dismiss for failure to state a claim upon which relief can be granted

of defendants Shelly Demora, Frederick Forte, Virginia L. Hall, Bruce Kolleda, Mark Kovinsky,

Bari Kuo, Raymond A. Mirra, Jr., Joseph T. Molieri, RAM Capital Group LLC, RAM Capital II,

LLC, RAM Realty Holdings LLC, Renee M. Sigloch, Danielle Stewart, Joseph A. Troilo, Jr.,

and Joseph Tropiano (collectively, the "RAM Defendants") (D.I. 63); (3) the motion to dismiss

for failure to state a claim upon which relief can be granted of defendant Patrick Walsh ("Walsh") (together with Eizen and the RAM Defendants, "defendants") (D.I. 67); (4) the motion for sanctions filed by the RAM Defendants (D.I. 258); and (5) plaintiffs' motion for leave to file a sur-reply brief regarding the motion for sanctions (D.I. 305). For the following reasons, I recommend that the court grant the motions to dismiss, deny the motion for sanctions, and deny the motion for leave to file a sur-reply brief.

## II.     BACKGROUND[1]

In 1991, plaintiff Gigi Jordan ("Jordan") founded Ambulatory Pharmaceutical Services, Inc. ("APS"), a healthcare company specializing in providing individualized home infusion services. (D.I. 47 at ¶¶ 6, 40) Following the success of APS, Jordan entered into a business relationship with Mirra[2] from 1991 through 2008, forming a complex network of holding companies, active businesses, and real estate holdings and trusts. (*Id.* at ¶¶ 7, 40) Mirra represented to Jordan that defendants Troilo, Molieri, Kolleda, Kovinsky, Eizen, Tropiano, and Walsh managed, controlled, and implemented Jordan and Mirra's respective business and financial affairs and acted co-equally for Jordan and Mirra as fiduciaries in the execution of their duties. (*Id.* at ¶¶ 55, 292)

In 1997, Mirra, Troilo, Molieri, and Kolleda organized RAM Capital to serve as a holding company for Jordan and Mirra's joint assets and business ventures. (*Id.* at ¶ 45) In 2002 and thereafter, Mirra, Troilo, Molieri, Kolleda, Tropiano, Kovinsky, and Eizen organized various

---

[1] When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). Consequently, the following background information is drawn from plaintiffs' second amended complaint dated July 9, 2014, and does not constitute findings of fact. (D.I. 47)

[2] Jordan and Mirra were also involved in a personal relationship beginning in 1990 or 1991. (D.I. 47 at ¶ 39) They divorced in November 2001. (*Id.* at ¶ 47)

holding companies and trusts to allegedly obfuscate the actual ownership interests of Jordan's business holdings. (*Id.*) Jordan and Mirra did not immediately separate their finances after they divorced in November 2001. (*Id.* at ¶ 47)

Plaintiffs Hawk Mountain LLC ("HM LLC"), Gigi Jordan ("Jordan"), Michelle E. Mitchell ("Mitchell"), and Kimberly Jordan ("Kim Jordan") (collectively, "plaintiffs") initiated the instant RICO action on December 23, 2013. (D.I. 1) On July 9, 2014, Plaintiffs filed their second amended complaint, seeking to recover more than $225,000,000.00 allegedly stolen by defendants through numerous acts of forgery and a pattern of bank, mail, and wire fraud. (D.I. 47 at ¶ 3) Jordan was the sole manager of HM LLC, a Delaware limited liability company organized on December 3, 2002. (*Id.* at ¶¶ 16-17) Mitchell, in her capacity as trustee of the Intercession Trust, is a current beneficiary of the Hawk Mountain Trust (the "HM Trust"), which held the membership interests in HM LLC as its sole asset. (*Id.* at ¶ 18) Kim Jordan is an indirect beneficiary of the HM Trust, having assigned her interest in the HM Trust to the Intercession Trust. (*Id.* at ¶ 19)

The RICO scheme alleged by plaintiffs in the present matter has four facets: (1) the alleged conversion of Jordan's bank accounts, (2) the alleged conversion of HM LLC and HM Trust assets, (3) the allegedly fraudulent property schemes, and (4) the allegedly fraudulent Separation and Distribution Agreement ("SDA").

## A.    Conversion and Misappropriation of Jordan's Bank Accounts

### 1.    Merrill Lynch Scheme

Jordan opened a Merrill Lynch account based on Mirra's recommendation in 1992. (*Id.* at ¶ 60) Walsh became Jordan's broker and private banker at Merrill Lynch. (*Id.* at ¶ 61) In 1997, Walsh advised Jordan to open two additional Merrill Lynch accounts to participate in a

3

covered writing account program intended to eliminate losses below the principal amounts invested. (*Id.* at ¶¶ 63-66)

In April 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh to open a new Merrill Lynch account jointly held by Jordan and Mirra. (*Id.* at ¶¶ 69-70) They then deposited more than $14 million of Jordan's money into the joint account without Jordan's knowledge or consent. (*Id.* at ¶¶ 71-73) Four months later, in September 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh allegedly forged Jordan's signature on account opening documents for the joint account. (*Id.* at ¶ 74)

In January 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh to convert Jordan's three individual Merrill Lynch accounts into joint accounts held with Mirra. (*Id.* at ¶¶ 76-82) Thereafter, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh opened additional Merrill Lynch accounts jointly held by Jordan and Mirra by forging Jordan's signature on account application forms. (*Id.* at ¶¶ 83-89) Between 2003 and 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature on wire transfer authorizations purporting to authorize Merrill Lynch to transfer Jordan's money to Mirra and various entities owned or controlled by defendants. (*Id.* at ¶¶ 90-92) Between 2005 and 2008, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature on loan applications and wire transfer authorizations, causing Merrill Lynch to loan millions of additional dollars to Mirra, RAM Capital, and other entities owned and controlled by Defendants, using Jordan's assets as collateral for the loans. (*Id.* at ¶¶ 93-99)

## 2.    Other Schemes

On August 29, 1997, Jordan sold APS to Integrated Health Services, Inc. ("IHS") in exchange for more than $34 million in cash and stock options. (*Id.* at ¶ 100) Mirra subsequently

4

urged Jordan to open a Smith Barney brokerage account in March 1998 with the proceeds from the sale. (*Id.* at ¶ 101) In June 1998, Mirra encouraged Jordan to execute a Smith Barney trading agreement, which was faxed to the account broker. (*Id.* at ¶ 102) Mirra, Troilo, Molieri, Kolleda, and Tropiano then coordinated the liquidation of Jordan's stock in the Smith Barney brokerage account and fraudulently transferred the funds out of the account without Jordan's knowledge or consent. (*Id.* at ¶ 103)

In 1998, Mirra conferred with Jordan regarding an "offshore asset protection" plan involving multiple offshore trusts, LLC's, and bank accounts. (*Id.* at ¶¶ 104-107) Pursuant to Mirra's proposal, both he and Jordan would transfer $7 million to a bank account in Geneva, Switzerland (the "BJB account"). (*Id.* at ¶ 108) A Nevis-based LLC named West-Highland Company LLC ("West Highland") was established, to be owned by Jordan initially, and then the bank holding the $7 million contributions would be held in an account to be established in the name of West Highland at BJB in Geneva. (*Id.* at ¶ 109) Jordan signed an agreement in accordance with Mirra's proposal. (*Id.* at ¶ 110) In July 1999, Mirra, Troilo, Molieri, Kolleda, and Tropiano forged Jordan's authorization to transfer the funds in Jordan's Smith Barney account to the BJB account, comprising the total initial funding for West Highland's BJB account. (*Id.* at ¶ 113) In 2001, Mirra fraudulently induced Jordan to assign him a fifty percent interest in West Highland by falsely representing that he had contributed half of the funds deposited into the account. (*Id.* at ¶¶ 112, 115)

Mirra, Troilo, Molieri, Kolleda, and Tropiano also used forged and fraudulent documents transmitted by mail and wire to convert Jordan's assets in various other bank and mutual fund accounts for their own use. (*Id.* at ¶ 116)

5

**B.    Hawk Mountain LLC & Hawk Mountain Trust Assets**

In 2002, Mirra, Troilo, Kolleda, and Kovinsky conspired with Eizen, a trusts and estates lawyer, to create a Grantor Retained Annuity Trust ("GRAT") called the Hawk Mountain Trust ("HM Trust"), with Jordan's son as the beneficiary. (*Id.* at ¶ 119) Eizen never met with or spoke to Jordan. (*Id.*) In December 2002, Mirra, Troilo, Kolleda, and Kovinsky advised Jordan to contribute millions of dollars to HM LLC and the HM Trust, indicating that Jordan would retain control over the funds, and Jordan agreed. (*Id.* at ¶¶ 120-129) However, once Jordan's money was deposited into HM LLC's Merrill Lynch account and the HM Trust, Mirra, Troilo, Molieri, Tropiano, Kolleda, Kovinsky, and Eizen forged Jordan's signature on a series of documents to legitimize their unauthorized actions in asserting control over the HM Trust and HM LLC. (*Id.* at ¶¶ 131-168)

Between 2006 and 2009, Defendants engaged in various efforts to conceal their scheme, including asserting that RAM Capital and its affiliates had no remaining value to distribute to Jordan, forging Jordan's signature on documents changing the registered agent for HM LLC, and assigning ownership interests in HM LLC to third parties without Jordan's knowledge or consent. (*Id.* at ¶¶ 169-176) In November 2009, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Eizen forged Jordan's signature on a document called the "Receipt, Release, Indemnification and Merger Agreement" (the "2009 Release") in connection with the HM Trust, retroactively releasing Troilo and Kolleda from all liability arising out of their administration of the HM Trust as of January 1, 2009. (*Id.* at ¶¶ 177-181)

On February 5, 2010, Jude Mirra, Jordan's child and the beneficiary of the HM Trust, died. (*Id.* at ¶ 183) Following his death, Kim Jordan became the beneficiary of the HM Trust. (*Id.*) Jordan is currently serving an eighteen-year sentence following her conviction for

6

manslaughter. James C. McKinley, Jr., *Gigi Jordan Receives 18-Year Sentence for Killing Her Son*, N.Y. Times, May 28, 2015.

In April 2010, Eizen, in his capacity as counsel for Troilo and Kolleda, contacted Jordan's counsel, Mark Petersen ("Petersen"), indicating that the assets in the HM Trust should be distributed to Kim Jordan as the beneficiary. (*Id.* at ¶ 184) Jordan, as manager of the HM LLC, instructed Walsh to move the HM LLC assets into an escrow account at Merrill Lynch in the name of the HM LLC. (*Id.*) Eizen subsequently demanded that the funds from the HM LLC be restored to the HM Trust. (*Id.* at ¶¶ 187-189) On May 17, 2010, Eizen sent a letter proposing a "Receipt, Release, Indemnification, Waiver of Accounting and Trust Termination Agreement" (the "2010 Proposed Release"), seeking a waiver of an accounting for the HM Trust and a release of Troilo and Kolleda for all claims. (*Id.* at ¶ 190)

On May 24, 2010, Eizen indicated that the HM LLC would be terminated and all assets of the HM LLC would be retitled in the name of the Trustees of the HM Trust, pending resolution of the HM Trust. (*Id.* at ¶ 192) The letter included an offer that would expire on May 26, 2010, requiring Jordan to sign the same indemnification and broad release of Troilo and Kolleda that was attached to Eizen's May 17, 2010 correspondence, and requiring Jordan to pay the HM Trust a nearly $8 million debt she did not owe. (*Id.* at ¶¶ 193-196) On May 28, 2010, Troilo, Kolleda, and Eizen filed a Certificate of Cancellation of the HM LLC with the Delaware Secretary of State, despite the fact that only Jordan had the authority to dissolve the HM LLC. (*Id.* at ¶¶ 197-198) On June 22, 2010, Troilo and Kolleda contacted Walsh to inform him that the HM LLC had been dissolved and the HM Trust was the sole owner of the assets held by the HM LLC. (*Id.* at ¶ 199) Troilo and Kolleda instructed Walsh to retitle the Merrill Lynch accounts held by the HM LLC in the name of the Trustees. (*Id.*) Jordan's trusts and estates

7

attorney, Carlyn S. McCaffrey, requested documents relating to Troilo and Kolleda's claims regarding the HM Trust, and noticed that the two sets of documents contained different versions of Jordan's signature. (*Id.* at ¶¶ 201-202)

On August 10, 2011, Troilo and Kolleda filed a petition in Pennsylvania in the Delaware County Court of Common Pleas, seeking to sell and distribute the assets of the HM Trust. (*Id.* at ¶¶ 203-210) The petition was dismissed on jurisdictional grounds, and Troilo and Kolleda brought a second action in the Delaware Court of Chancery seeking the same relief. (*Id.* at ¶¶ 211-219) The Court of Chancery action was still pending at the time the second amended complaint in the instant action was filed. (*Id.* at ¶ 220) On July 21, 2014, the Court of Chancery ruled orally on summary judgment, concluding that (1) Kimberly Jordan was the sole beneficiary of the HM Trust, (2) respondents waived all claims of fraud or forgery against Troilo and Kolleda in their official capacity as co-trustees of the HM Trust and as members of the HM LLC, despite being given two extensions of time to raise such claims, and (3) Troilo and Kolleda were entitled to a release and judicial discharge in their capacities as co-trustees and members of the HM LLC. *In re Hawk Mountain Trust Dated December 12, 2002*, 2015 WL 5243328, at *2 (Del. Ch. Sept. 8, 2015). On September 8, 2015, the Court of Chancery granted in part Troilo and Kolleda's motion for the final reimbursement of attorneys' fees, costs, and expenses. *Id.*

## C. Fraudulent Property Schemes

Defendants also engaged in a scheme to divest Jordan of her equity in several real properties. (*Id.* at ¶ 225) On June 30, 1995, Jordan purchased a property located at 2932 North Atlantic Boulevard in Fort Lauderdale, Florida, for $1.65 million. (*Id.* at ¶ 226) On July 12, 1996, Mirra and Troilo forged Jordan's signature on a warranty deed purporting to add Mirra as a co-owner of the property and recorded the deed. (*Id.* at ¶¶ 228-229) On April 10, 2002, Mirra,

8

Troilo, Kolleda, and Tropiano forged Jordan's signatures on mortgage loan application documents and obtained a $375,000 mortgage on the property. (*Id.* at ¶¶ 231-234) On August 16, 2006, Mirra, Troilo, Kolleda, and Tropiano sold the property for $4.8 million and retained the proceeds. (*Id.* at ¶¶ 235-240)

On June 23, 2000, Mirra, Troilo, Kolleda, and Tropiano caused APS, which was jointly owned by Jordan and Mirra, to purchase a property located at 2937 North Atlantic Boulevard, Fort Lauderdale, Florida, for $660,000. (*Id.* at ¶ 241) On December 27, 2001, Mirra, Troilo, Kolleda, and Tropiano caused the property to be sold for $10.00 to West Highland. (*Id.* at ¶ 243) On April 12, 2004, Mirra, Troilo, Kolleda, and Tropiano sold the property for $1.00 to "Gigi Jordan and her Husband Raymond Mirra." (*Id.* at ¶ 245) Jordan was not advised of the purchase or the sales. (*Id.* at ¶¶ 242, 244, 246) On the same date, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature and authorized Merrill Lynch to wire $345,631.96 to a West Highland account to pay off the mortgage on the property. (*Id.* at ¶¶ 247-248) On April 28, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano forged Jordan's signature on a warranty deed selling the property for $850,000 without Jordan's knowledge. (*Id.* at ¶¶ 249-251)

In 2000, Mirra, Troilo, Kolleda, Kovinsky, and Tropiano incorporated RAM Developers to engage in real estate investments, and falsely represented to Jordan that she was a fifty percent owner of RAM Developers. (*Id.* at ¶¶ 253-256) On April 4, 2001, Jordan provided $4.1 million to RAM Developers to be used to purchase a property located at 352 West End Avenue, New York, New York. (*Id.* at ¶ 257) On April 5, 2001, Jordan permitted the property to be titled in the name of RAM Developers, rather than in Jordan's name individually. (*Id.* at ¶ 260) On July 8, 2002, Mirra, Troilo, Kolleda, Kovinsky, and Tropiano sold the property for $4.35 million. (*Id.* at ¶ 261)

On April 5, 2002, Mirra and Jordan bought a property in Concord, Virginia for $3.265 million. (*Id.* at ¶ 265)  On August 27, 2002, Mirra took out a $2 million mortgage from Merrill Lynch on the property without Jordan's knowledge. (*Id.* at ¶ 268)  Between February 2003 and June 2004, Mirra, Troilo, Kolleda, and Tropiano bought additional lots to add to the existing acreage of the property without Jordan's knowledge. (*Id.* at ¶ 269)  On June 3, 2004, Mirra and Jordan borrowed $3 million from JPMorgan Chase for payment on the purchase of the property. (*Id.* at ¶ 271)  On March 31, 2005, the $3 million JPMorgan mortgage was increased by $1 million and converted to a home equity line of credit. (*Id.* at ¶ 272)  On June 3, 2005, a loan was obtained on the property from Merrill Lynch in the amount of $2 million. (*Id.* at 281)

On May 31, 2002, Jordan and Mirra purchased a property in North Garden, Virginia (the "Taylors Gap Road Property") for $1.8 million. (*Id.* at ¶ 284)  On December 4, 2003, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature on a deed conveying the property from Jordan and Mirra to RAM Realty. (*Id.* at ¶ 285)  RAM Realty subsequently subdivided and sold off the Taylors Gap Road Property for $2.151 million. (*Id.* at ¶ 287)

### D.     The Separation and Distribution Agreement

On March 12, 2008, Jordan and Mirra executed a Separation and Distribution Agreement ("SDA"). (*Id.* at ¶ 291)  In connection with a merger between Biomed America, Inc. ("Biomed") and Allion Healthcare, Inc. ("Allion"), on March 4, 2008, Mirra, Troilo, Molieri, Kolleda, and Tropiano falsely represented that Jordan's half of the Biomed stock was valued at $4.9 million, when it was actually worth much more than that. (*Id.* at ¶¶ 299-300)  Pursuant to the terms of the SDA, Jordan transferred her fifteen percent ownership interest in Biomed to an LLC owned by Mirra for $4.9 million. (*Id.* at ¶ 301)  Through this transaction, Mirra received $78 million, $39 million of which was rightfully Jordan's. (*Id.* at ¶¶ 302-303)

Mirra subsequently orchestrated two transactions resulting in the sale of Jordan's ownership interests in APS and Specialty Pharmacy, Inc. to AmerisourceBergen Corporation ("ABC") in 2002 for $30 million. (*Id.* at ¶ 305) On April 29, 2002, a fraudulent Merrill Lynch account received nearly $15 million in connection with the first transaction. (*Id.* at ¶ 308) In December 2002, Bioservices was acquired by ABC for $159 million, yielding $75 million more than Mirra had reported. (*Id.* at ¶ 309) The actual profits of the sale were routed by Mirra to another unknown account. (*Id.* at ¶ 313)

On December 22, 2004, ABC sued Mirra for conversion, breach of contract, breach of fiduciary duty, civil conspiracy, and unjust enrichment, alleging that Mirra set up a pharmacy called Associated Prescription Services and induced the key employees of APS to move to the new company. (*Id.* at ¶ 318) Mirra settled the litigation with ABC. (*Id.* at ¶ 319) In October 2009, Allion's shareholders sued Mirra and the board, alleging that Mirra conspired with the board and failed to engage in an honest and fair sale process, failed to maximize shareholder value in connection with the merger, failed to provide material information regarding the merger, and misrepresented the sale process. (*Id.* at ¶ 320) In May 2010, the New York Supreme Court denied the defendants' motion to dismiss, and Mirra negotiated a settlement. (*Id.* at ¶¶ 321-322)

On March 4, 2008, Mirra, Troilo, Kolleda, and Tropiano falsely represented to Jordan that she had a fifty percent interest in four companies, including VasGene, PrideCare, ARC, and Cancer Innovations, which had no value. (*Id.* at ¶ 324) Defendants falsely represented that the companies had no value to induce Jordan to surrender her rightful interests in the companies and execute the SDA. (*Id.* at ¶ 329) In February 2008, Mirra, Troilo, Kolleda, and Tropiano falsely represented that RAM Capital had no assets or value, causing Jordan to forfeit her fifty percent interest in the company. (*Id.* at ¶¶ 332-335)

11

On February 29, 2008, Mirra, Troilo, Kolleda, and Tropiano sent a purportedly complete schedule of the private companies in which Jordan and Mirra held joint interests, but did not disclose the assets of subsidiaries, holding companies, or companies related to RAM Capital. (*Id.* at ¶¶ 336-337)  The schedule also failed to disclose other companies in which Jordan and Mirra had joint interests that were active and in good standing at the time the SDA was executed. (*Id.* at ¶ 341)

The SDA also misrepresented the total value of the real estate properties jointly held by Jordan and Mirra, claiming that the total net value of the jointly held properties was $15,710,000, when in fact the total net value was in excess of $22 million.  (*Id.* at ¶¶ 344-346)  Mirra, Troilo, Kolleda, and Tropiano represented that a Tahoe property bought in 1999 exclusively by Jordan was jointly held, and they bought two properties in Santa Barbara, California titled in the name of RAM Realty, using money stolen from Jordan and Mirra's joint bank account in the spring of 2004.  (*Id.* at ¶¶ 347-348, 352)  The SDA represented that Jordan was responsible for fifty percent of the fraudulent encumbrances on the Concord, Virginia property, and underestimated the value of the property by at least $6 million.  (*Id.* at ¶¶ 356-357)

Moreover, the SDA contained misrepresentations and concealments regarding the contributions to West Highland LLC and the liabilities of the Merrill Lynch accounts, indicating that the assets were jointly held and Mirra had contributed half of the funds, and Jordan and Mirra were jointly and severally liable for any liabilities, when in fact the contributions were made solely by Jordan and the liabilities were incurred solely by Mirra.  (*Id.* at ¶¶ 360-369)  Mirra succeeded in inducing Jordan to surrender fifty percent of the value of the Merrill Lynch asset accounts by falsely assuming fifty percent of the joint liabilities, and Jordan paid Mirra $3.4 million as consideration for his assumption of the liabilities.  (*Id.* at ¶ 371)  Mirra, Troilo,

12

Kolleda, and Tropiano also falsely represented that all of Mirra's financial obligations to Jordan prior to January 31, 2003 had been satisfied. (*Id.* at ¶¶ 375-378)

Contemporaneous with the execution of the SDA, Mirra and Jordan entered into a Mutual General Release Document ("Release"), which purported to release defendants from liability arising from their fraudulent conduct. (*Id.* at ¶¶ 380-382) According to Jordan, she reviewed the terms and conditions of the Release in March 2008 and informed her counsel that she wanted paragraph 3 of the Release stricken. (*Id.* at ¶¶ 381-383) Mirra, Troilo, Kolleda, and Tropiano allegedly agreed to strike the language and sent signature pages to Jordan's counsel. (*Id.* at ¶ 384) Troilo resent the signature page of the Release for execution without removing the disputed language from the Release, and neither Jordan nor her counsel reviewed the full version of the Release prior to its execution. (*Id.* at ¶¶ 385-387)

## III.   LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations

13

allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

When determining whether dismissal is appropriate, the court must take three steps.[3] *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must identify the elements of the claim. *Iqbal*, 556 U.S. at 675. Second, the court must identify and reject conclusory allegations. *Id.* at 678. Third, the court should assume the veracity of the well-pleaded factual allegations identified under the first prong of the analysis, and determine whether they are sufficiently alleged to state a claim for relief. *Id.*; *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The third prong presents a context-specific inquiry that "draw[s] on [the court's] experience and common sense." *Id.* at 663-64; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## IV.    DISCUSSION

### A.    Statute of Limitations

The Third Circuit has recognized that "the statute of limitations can serve as the basis for dismissal under Fed. R. Civ. P. 12(b)(6), as long as the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *McPherson v. United States*, 392 F. App'x 938, 943 (3d Cir. 2010) (quotation marks and

---

[3] Although *Iqbal* describes the analysis as a "two-pronged approach," the Supreme Court observed that it is often necessary to "begin by taking note of the elements a plaintiff must plead to state a claim." 556 U.S. at 675, 679. For this reason, the Third Circuit has adopted a three-pronged approach. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

citations omitted).  A civil action under RICO is subject to a four-year limitations period.
*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 232-33 (3d Cir. 2004).  The Third
Circuit "appl[ies] an injury discovery rule whereby a RICO claim accrues when plaintiffs knew
or should have known of their injury." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d
Cir. 2006) (internal citations and quotation marks omitted).  The rule requires courts to first
perform an objective inquiry to determine whether plaintiffs were on inquiry notice and "should
have known of the basis of their claims, which depends on whether [and when] they had
sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm
warnings of culpable activity." *Id.* (internal citations and quotation marks omitted); *see also
Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001).  Next, the court conducts
a subjective inquiry focusing on "a plaintiff's actual awareness of suspicious circumstances or . .
. the ability of a plaintiff to understand their import." *Cetel*, 460 F.3d at 507.

### 1.    Facial time bar

The RAM Defendants allege that the second amended complaint is facially barred under
the four-year statute of limitations because the pattern of fraudulent activity began in 1997 and
resulted in damages starting in 2002, but no amount of the claimed RICO damages resulted from
acts occurring after December 23, 2009.  (D.I. 64 at 9)  In response, plaintiffs contend that they
did not discover their injuries until early 2010, when plaintiffs' counsel obtained copies of the
allegedly forged documents.  (D.I. 73 at 7)  Plaintiffs further allege that they continued to incur
RICO damages resulting from defendants' continuing acts of mail and wire fraud through 2014.
(*Id.* at 8)

The original complaint was filed in this action on December 23, 2013.  (D.I. 1)  Under
the four-year statute of limitations period, plaintiffs' claims must have accrued on December 23,

2009 or thereafter. *See Prudential*, 359 F.3d at 232-33.  To determine when plaintiffs' claims accrued, courts within the Third Circuit apply "an injury discovery rule whereby a RICO claim accrues when plaintiffs knew or should have known of their injury." *Cetel*, 460 F.3d at 507 (internal citations and quotation marks omitted).  The court concludes that plaintiffs should have known of their injuries relating to representations made in the SDA as of March 2008, for the reasons set forth in the court's inquiry notice analysis at § IV.A.2, *infra*.  Plaintiffs' allegations that they did not discover their injuries until at least early 2010 are contradicted by representations in the second amended complaint indicating that defendants' schemes were obvious from the face of the SDA.  (D.I. 47 at ¶¶ 9, 15, 292)

The second amended complaint contains allegations regarding purportedly fraudulent acts committed by certain defendants[4] in 2010.  However, the second amended complaint alleges no injuries in connection with defendants' unsuccessful efforts to obtain a second fraudulent release regarding the HM Trust, their failed attempt to compel Jordan to repay an $8 million debt for which she was not responsible, or the filing of a fraudulent certificate of cancellation on behalf of HM LLC.  (D.I. 47 at ¶¶ 184-202)  The statute of limitations analysis for a RICO claim is based on the discovery of the alleged injury, and conduct resulting in no pleaded injury cannot constitute a viable RICO claim.  *See Cetel*, 460 F.3d at 507; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (recognizing that the RICO statute accrues each time a plaintiff discovers, or should have discovered, a new injury, rather than accruing upon "the commission of a separable, new predicate act."); *Tammera v. Grossman*, 2010 WL 1372406, at *6 (D.N.J. Mar. 29, 2010)

---

[4] Troilo, Kolleda, Mirra, Eizen, Walsh, and Kovinsky are the only defendants mentioned in connection with the allegations arising in 2010.  (D.I. 47 at ¶¶ 184-224)

16

("It is injury, not racketeering activity, which triggers the accrual of the statute of limitations for a RICO action.").

The second amended complaint also alleges that Troilo and Kolleda initiated two actions in the Delaware Court of Common Pleas and Court of Chancery in 2011 and 2012, respectively. (D.I. 47 at ¶¶ 203-224) According to the allegations in the second amended complaint, the petitions contained false and fraudulent misrepresentations regarding conduct beginning in 2002 with respect to the HM Trust. (*Id.*) The only injury alleged in connection with the commencement of these lawsuits is the $4 million in attorneys' fees expended by plaintiffs to defend against the actions. (D.I. 47 at ¶¶ 203-224)

The federal RICO statute creates a civil remedy, including an award of treble damages, costs, and attorneys' fees, for "any person injured in his business or property" by reason of a violation of one of RICO's substantive provisions. *Brown v. Access Midstream Partners, L.P.*, -- - F. Supp. 3d ----, 2015 WL 5829755, at *7 (M.D. Pa. Sept. 30, 2015) (quoting 18 U.S.C. § 1964(c)). "While certain legal fees can be the type of concrete out-of-pocket expenses required to demonstrate injuries under RICO, the attorney's fees injury must have been proximately caused by the defendant's [racketeering activities]." *Macauley v. Estate of Nicholas*, 7 F. Supp. 3d 468, 480 (E.D. Pa. 2014) (internal citations and quotation marks omitted). A defendant's alleged RICO violation and the plaintiff's injuries cannot be directly related if the plaintiff did not rely to his or her detriment on the violation. *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 804-06 (E.D. Pa. 2007); *see also Kimmel v. Phelan Hallinan & Schmieg, PC*, 847 F. Supp. 2d 753, 771 n.15 (E.D. Pa. 2012). The second amended complaint generally asserts that Jordan relied upon Troilo and Kolleda's misrepresentations when she retained counsel to contest the petitions. (D.I. 47 at ¶ 204) However, the fact that Jordan contested the petitions

17

demonstrates that she did not justifiably rely on Troilo and Kolleda's representations. *See Walter*, 480 F. Supp. 2d at 806 ("Plaintiffs' course of action . . . is the opposite of reliance; it's defiance. After being (falsely) told they were liable on the debt, they hired lawyers and fought (and won) the lawsuits."); *Kimmel*, 847 F. Supp. 2d at 771 (observing that, "far from relying on the defendants' alleged misrepresentations and wrongful conduct, they instead contested these representations in court").

Moreover, the second amended complaint's allegations pertaining to litigation in Delaware state courts are tied to the same conduct and injuries predating the limitations period. Specifically, the second amended complaint indicates that the petitions were based on events surrounding the opening of the HM Trust in 2002 and the execution of the 2009 Release. (D.I. 47 at ¶¶ 206-210; 215; 217-219) In accordance with the separate accrual rule applicable to RICO claims, "the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act." *Klehr*, 521 U.S. at 190. However, courts within the Third Circuit have expressly stated that "continuing efforts to conceal the initial fraud . . . [are] not separate and distinct fraudulent acts resulting in new and independent injuries." *Matthews v. Kidder, Peabody & Co., Inc.*, 2000 WL 33726916, at *18 (W.D. Pa. Aug. 18, 2000). The allegations in the second amended complaint characterize the petitions filed by Troilo and Kolleda as materially false because Troilo and Kolleda were aware that the documents relating to the HM Trust were forged. (D.I. 47 at ¶¶ 205-210; 215-219) The forgeries that were the subject of the petitions in the Delaware state court actions[5]

---

[5] Vice Chancellor Parsons noted that it was "much more difficult . . . to pin [Kimberly Jordan, the Intercession Trust, and Michelle Mitchell] down on the contours of their allegations of fraud and forgery against [Troilo and Kolleda] . . . . . [Kimberly Jordan, the Intercession Trust, and Michelle Mitchell] failed to state any claim of fraud or forgery against [Troilo and Kolleda] in

18

occurred outside the limitations period, so it is recommended that plaintiffs' recovery based on these allegations should be time barred.

### 2.   Inquiry notice

The court analyzes inquiry notice using a two-step process in which the defendant first bears the burden to show the existence of objective "storm warnings." *Cetel*, 460 F.3d at 507. Storm warnings "include . . . any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Mathews*, 260 F.3d at 252. In determining whether information constitutes a storm warning, a plaintiff "need not be aware of the suspicious circumstances or understand their import. It is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. Thus, investors are presumed to have read . . . information relating to their investments." *Id.* Next, the burden shifts to the plaintiff to show that the plaintiff subjectively "exercised reasonable diligence but [was] unable to find and avoid the storm." *Cetel*, 460 F.3d at 507.

The RAM Defendants contend that plaintiffs were on inquiry notice of their claims no later than March 2008, when Jordan executed the SDA listing the joint Merrill Lynch accounts allegedly opened without Jordan's knowledge or consent, but conducted no diligence into the origin of those accounts. (D.I. 64 at 12, 15) According to the RAM Defendants, an objectively reasonable person in Jordan's position would have also noticed and investigated the omission of three properties titled in Jordan's name from the SDA's Real Estate Holdings section. (*Id.* at 14 n.12) The RAM Defendants allege that the second amended complaint does not claim that

---

their capacity as co-trustees by [the extended] deadline." *In re Hawk Mountain Trust Dated December 12, 2002*, 2015 WL 5243328, at *2 (Del. Ch. Sept. 8, 2015).

Jordan failed to review the SDA, or that she was incapable of understanding its terms, and Jordan was represented by counsel in her review and execution of the SDA. (*Id.* at 13)

In response, plaintiffs argue that the diligence inquiry involves factual questions not properly resolved on a motion to dismiss, and the statute of limitations should be tolled to allow sufficient time to investigate and file an adequately-pleaded complaint after plaintiffs actually learned of the existence of the Merrill Lynch accounts. (D.I. 73 at 16-17) Plaintiffs stress that Jordan relied on defendants as her fiduciaries and entrusted the management of her financial affairs to them, delaying her discovery of their alleged crimes. (*Id.* at 18)

Jordan's review and execution of the SDA should have put plaintiffs on inquiry notice of the alleged fraud in March 2008. *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 218-19 (3d Cir. 2007) (concluding that news articles which were not company-specific, but referred to the practice of mutual fund brokerages selling certain classes of stock at higher commissions, were a sufficient storm warning that the representations made by Merrill in the registration statements were not accurate); *Hockenberry v. Diversified Ventures, Inc.*, 2005 WL 1458768, at *2 (M.D. Pa. June 20, 2005) (holding that plaintiffs should have known of their injury "simply b[y] looking at and signing" the HUD-1 form, which outlined the amounts to be paid, and to whom). The SDA[6] expressly lists all of Jordan and Mirra's jointly held assets, including the joint Merrill Lynch accounts that were allegedly funded with Jordan's assets. (D.I. 47, Ex. 1 at

---

[6] At the motion to dismiss stage, the court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Daoud v. City of Wilmington*, 894 F. Supp. 2d 544, 550 (D. Del. 2012) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994)). The SDA is attached to the second amended complaint as an exhibit, and is incorporated into the second amended complaint by reference. (D.I. 47, Ex. 1) Therefore, it is properly considered by the court at this stage of the proceedings.

20

Schedule 2.1.1) The significance of the SDA cannot be discounted by plaintiffs, who admitted

that it "divided up the assets that Ms. Jordan and Ray Mirra had held jointly over the years of

their business and personal relationship." (12/11/14 Tr. at 58:18-21) The second amended

complaint states that the SDA contained "outright lies about the largest of Jordan's interests[,]

intentional omissions about small but clearly valuable companies, and extended across the entire

universe of Jordan/Mirra assets, including holdings and ownership companies, interests in trusts

and LLCs, real estate ownership, equitable holdings and liabilities." (D.I. 47 at ¶ 292) The

second amended complaint also confirms that Jordan was represented by separate counsel in the

negotiation and execution of the SDA. (*Id.* at ¶ 294)

Notably absent from the second amended complaint is any allegation that Jordan was

prevented from accessing or reviewing the SDA or the account statements for the allegedly

fraudulent Merrill Lynch accounts. *See Travis v. Vanguard Grp., Inc.*, 2008 WL 2073372, at *4

(E.D. Pa. May 15, 2008) (rejecting plaintiff's purported reliance on her husband's

representations, which contradicted her financial statements, as a valid reason to toll the statute

of limitations). At oral argument, counsel argued that Jordan did not often know whether she

owned one property or another, or what her money was being used to purchase. (12/11/14 Tr. at

58:1-6) However, a lack of awareness of her financial affairs does not excuse Jordan's

obligation to undertake further inquiry after a review of the SDA. In view of the Third Circuit's

tenet that investors are presumed to have read materials related to their investments, it is

objectively unreasonable to presume that Jordan was not aware of these storm warnings when

she executed the SDA. *See Mathews*, 260 F.3d at 252. Consequently, defendants have satisfied

the objective prong of the inquiry.

21

Because the second amended complaint acknowledges the omission or improper disclosure of various holdings in the SDA such that a reasonable investor would have been alerted to potential wrongdoing, the burden to show subjectively reasonable diligence to discover the injury shifts to plaintiffs. *Mathews*, 260 F.3d at 252 ("[I]f the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries."). However, the second amended complaint is devoid of facts demonstrating the exercise of reasonable diligence to discover the fraud following the execution of the SDA in March 2008. *See Norman v. Elkin*, C.A. No. 06-05-LPS, 2015 WL 4886049, at \*3 (D. Del. Aug. 14, 2015) ("The Court is not holding that a reasonable person knowing all of the foregoing would know he had a claim . . . only that such a person would know enough to put him on notice that he should undertake further inquiry, in order to determine if a wrong had been committed against him. That is inquiry notice."). Instead, the second amended complaint vaguely alleges that plaintiffs learned of defendants' fraudulent activity "in 2010 and thereafter,"[7] when the alleged forgeries were uncovered, but well after the execution of the SDA. (D.I. 47 at ¶ 9) In the absence of pleaded allegations that plaintiffs investigated the existence and distribution of assets identified in the SDA after reviewing and executing the agreement in March 2008, the court cannot conclude that plaintiffs exercised reasonable diligence to discover the alleged fraud.

Plaintiffs' claim that the statute of limitations should not begin to run until plaintiffs have had an opportunity to thoroughly investigate the storm warnings is without merit. Pursuant to

---

[7] Courts within the Third Circuit have rejected attempts to vaguely define the limitations period without providing a specific date in the pleadings. *See Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2010 WL 597475, at \*2-4 (W.D. Pa. Feb. 16, 2010) (finding that the disputed language "occurred on a number of occasions including in the winter of 2007-08 on three or four occasions" does not state when plaintiffs first discovered their alleged injuries).

Third Circuit precedent, plaintiffs have four years from the date they objectively knew or should have known they were injured to file their RICO claim. *See Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004); *Forbes v. Eagleson*, 228 F.3d 471, 484 (3d Cir. 2000). The alleged difficulty of discovering the fraud does not provide an exception to the rule:

> [I]f plaintiffs fail to investigate, the . . . statute of limitations will begin to run from the time at which there objectively were storm warnings of the fraud. Moreover, plaintiffs "cannot bolster their cause by arguing the difficulty of discovering the alleged fraud . . . excusing [plaintiffs'] lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury . . . would, in effect, discourage investigation. . . ."

*Dalicandro v. Legalgard, Inc.*, 2004 WL 250546, at *5 (E.D. Pa. Jan. 21, 2004) (quoting *Mathews*, 260 F.3d at 252 n.16).

Plaintiffs' reliance on the Third Circuit's decision in *Merck* for the proposition that further investigation is required to sufficiently plead a cause of action under RICO is misplaced because *Merck* addresses causes of action for securities fraud, as opposed to RICO claims. *See In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 543 F.3d 150 (3d Cir. 2008), *aff'd*, *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). The Second Circuit has expressly rejected the application of *Merck* in this context, and distinguished the manner in which the discovery rule is applied to causes of action for securities fraud versus RICO claims. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012) ("In the securities fraud context, discovery of facts constituting the violation, including scienter, is necessary for the claim to accrue because the statute of limitations requires it . . . . But *Merck*'s scienter discovery requirement does not apply outside the realm of the statute that it interpreted . . . . [A] RICO claim accrues upon the discovery of the injury alone."). Moreover, the Third Circuit relied on the Supreme Court's decision in *Rotella v. Wood* in concluding that the general discovery accrual rule applies to a

23

RICO claim, whereby the "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock" because the RICO statute of limitations is "silent on the issue" of accrual. *Pension Trust Fund v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 274 (3d Cir. 2013) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Accordingly, the four-year statute of limitations for plaintiffs' RICO claims began to run as of the March 2008 execution of the SDA, when the injury should have reasonably been discovered. Plaintiffs' failure to adequately investigate the storm warnings in conjunction with the execution of the SDA precludes a finding that the claims in the second amended complaint were timely brought.

### 3.    Equitable tolling doctrine

Under the equitable tolling doctrine, which applies when a defendant fraudulently conceals a scheme to prevent the plaintiff from discovering the injury, the plaintiff bears the burden to plead three elements in a conjunctive inquiry: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts." *Cetel*, 460 F.3d at 509 (citing *Mathews*, 260 F.3d at 256). The equitable tolling doctrine may not be pleaded by strategic omission, but rather "is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr*, 521 U.S. at 195 (internal quotation marks and citations omitted); *see also Prudential Ins. Co. of Am.*, 359 F.3d at 238. A plaintiff's allegations regarding the equitable tolling doctrine "must be sufficiently specific to satisfy the requirements of Fed. R. Civ. P. 9(b)." *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 273 (E.D. Pa. 1986).

24

The RAM Defendants allege that plaintiffs' reliance on the doctrine of equitable tolling is unavailing because the second amended complaint is silent regarding how the alleged fraud was discovered and how plaintiffs diligently sought to reveal the alleged fraud. (D.I. 64 at 10-11) According to the RAM Defendants, equitable tolling is inapplicable if the plaintiff is on inquiry notice of the possible existence of the claim, and the RAM Defendants have already shown that plaintiffs had inquiry notice in the present case. (D.I. 78 at 10) Moreover, the RAM Defendants contend that their roles as alleged fiduciaries to plaintiffs has no bearing on the analysis under federal common law, which requires that a defendant must actively mislead a plaintiff. (*Id.* at 11)

In response, plaintiffs allege that the equitable tolling doctrine is not ripe for resolution on a Rule 12(b)(6) motion to dismiss because it requires a fact-intensive inquiry. (D.I. 73 at 8-9) With respect to the requirements set forth in *Cetel*, plaintiffs contend that silence or nondisclosure is sufficient to constitute an affirmative act of concealment when the defendant has a fiduciary relationship with the plaintiff, and plaintiffs had no notice of the possible claim due to their reliance on defendants' affirmative acts of concealment. (*Id.* at 9-13) Plaintiffs contend that they exercised reasonable due diligence in view of the fact that Jordan had a fiduciary relationship with defendants, and they reasonably discovered the fraud after obtaining independent counsel in 2010. (*Id.* at 14-15)

As a preliminary matter, a court may grant a Rule 12(b)(6) motion to dismiss based on a statute of limitations defense such as equitable tolling if "the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Oshiver*, 38 F.3d at 1384 n.1. In accordance with the Third Circuit's ruling in *Oshiver*, cases within the Third Circuit have granted motions to dismiss after rejecting

25

equitable tolling arguments. *See Kuznyetsov*, 2010 WL 597475, at \*4-5 (concluding that pay

statements should have specifically put plaintiffs on notice that they were not being paid in full,

and vague references to an investigation fail to constitute reasonable diligence in pursuing the

underlying claims); *Hockenberry*, 2005 WL 1458768, at \*2-3 (holding that plaintiffs' RICO

claims were time-barred at the motion to dismiss stage after concluding that plaintiffs were

aware, or should have been aware, of the facts supporting their claim); *Dalicandro*, 2004 WL

250546, at \*5 ("[A]lthough these inquiries are fact intensive and hence courts are generally

reluctant to dismiss a complaint as untimely prior to discovery, such a dismissal may be

warranted where a plaintiff has pled 'facts that show that his suit is time-barred or otherwise

without merit.'" (quoting *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir.

1993)).

The second amended complaint fails to satisfy any of the *Cetel* requirements for the

doctrine of equitable tolling. It is undisputed that the second amended complaint does not allege

defendants actively misled plaintiffs in accordance with the first requirement of the *Cetel*

inquiry. (D.I. 64 at 10; D.I. 73 at 9-10) Contrary to plaintiffs' assertions, the federal common

law equitable tolling doctrine does not recognize an exception for a fiduciary relationship when

determining whether a defendant has actively misled a plaintiff. *See White v. PNC Fin. Servs.*

*Grp., Inc.*, 2014 WL 4063344, at \*3 (E.D. Pa. Aug. 18, 2014) (stating that active misleading

requires a showing that the defendant "engaged in affirmative acts of concealment designed to

mislead the plaintiff [] regarding facts supporting" his claim, and stressing that a "plaintiff must

show active misleading by the defendant." (quoting *Forbes*, 228 F.3d at 487)); *Cetel*, 460 F.3d at

509 (requiring a showing that "the defendant actively misled the plaintiff."); *see also Calabrese*

*v. State Farm Mut. Auto. Ins. Co.*, 996 F.2d 1219 (7th Cir. 1993) (citing *Hupp v. Gray*, 500 F.2d

26

993, 997 (7th Cir. 1974)) (finding a conclusory assertion that a plaintiff relied on the

representations of a fiduciary is insufficient to invoke the equitable tolling doctrine). The cases

cited by plaintiffs are inapposite because they analyze the Delaware state common law equitable

tolling doctrine in the context of claims such as breach of fiduciary duty and unjust enrichment.

*See In re Tyson Foods Consol. S'holder Litig.*, 919 A.2d 563 (Del. Ch. 2007) (state common law

equitable tolling doctrine applied to breach of fiduciary duty claim); *In re Dean Witter P'ship*

*Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (same); *In re Fruehauf Trailer Corp.*,

250 B.R. 168, 186 (D. Del. 2000) (same); *Ausikaitis v. Kiani*, 962 F. Supp. 2d 661, 674 (D. Del.

2013) (applying the Delaware state common law doctrine of equitable tolling to state law claims

for breach of fiduciary duty and unjust enrichment).

Plaintiffs fail to satisfy the second prong of the equitable tolling analysis because the

second amended complaint does not sufficiently explain how the fraud was discovered to allow

the court to determine whether the fraud was affirmatively concealed. The second amended

complaint describes plaintiffs' discovery of the alleged fraud in three paragraphs:

> The Defendants' true intentions only became known in 2010 and thereafter, when
> Plaintiffs learned of Defendants' forgeries on multiple documents causing the
> conversion of over $12,200,000.00, of those assets.

(D.I. 47 at ¶ 9)

> In this way, Plaintiffs did not discover and could not reasonably have discovered
> either the existence of the Enterprise, their array of frauds or the damages and
> injuries attributable to this pattern of unlawful activities until 2010 or thereafter.

(*Id.* at ¶ 15)

> [T]he following purported joint liabilities were based upon fraudulent and forged
> documents that were not discovered until 2010 and thereafter . . .

27

(*Id.* at ¶ 366) Each of these paragraphs provides no details regarding the identity of the specific individual(s) who made the discovery, the circumstances of the discovery, or the specific date on which the discovery occurred. *See In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *25 (D.N.J. Oct. 20, 2011)[8] (rejecting allegations of secrecy preventing discovery of the conspiracy where plaintiffs failed to plead when and how they ultimately discovered the alleged conspiracy).

Plaintiffs cite case law[9] suggesting that there is no requirement to plead the specific date, place, and time of the alleged fraud if an alternative means of "injecting precision and some measure of substantiation into their allegations of fraud" exists. *See Albright v. Viacom*, 2009 WL 222784, at *1-2 (W.D. Pa. Jan. 29, 2009); *Barrett v. Viacom*, 2009 WL 185979 (W.D. Pa. Jan. 23, 2009). In these age discrimination cases, the defendant failed to provide demographic data to people involved in a reduction of force, and failed to inform the employees that such information was available to the employees. *Id.* The cases are distinguishable from the facts before this court because the second amended complaint alleges that the SDA was replete with evidence of defendants' fraud, and plaintiffs have had access to the SDA since at least March 2008. (D.I. 47 at ¶ 291) ("The SDA reveals both the roadmap for the purpose and modus operandi employed by the Defendants in the conversion of Plaintiffs' assets by the Defendants.").

---

[8] *In re Magnesium Oxide Antitrust Litigation* involved a fraudulent concealment claim, as opposed to an equitable tolling defense. 2011 WL 5008090. Although the two doctrines are distinct, *see Kuznyetsov*, 2010 WL 597475, at *4, the required elements are nearly identical, as a claim for fraudulent concealment requires a showing of "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action," *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993) (citation omitted).

[9] Plaintiffs mischaracterize these unpublished decisions from the Western District of Pennsylvania as "well-established Third Circuit precedent." (D.I. 73 at 11)

Regarding the third element of the *Cetel* test, the court previously concluded that

plaintiffs were on inquiry notice of a possible claim, but failed to investigate it. *See* § IV.A.2,

*supra.* "[A] finding that plaintiffs did not exercise reasonable diligence for the determination of

when the claim accrues will also likely foreclose the possibility of equitable tolling." *Cetel*, 460

F.3d at 509 (citing *Mathews*, 260 F.3d at 157 (applying same rationale in the context of a

fraudulent concealment defense)). Consequently, plaintiffs have failed to meet their burden to

show that the statute of limitations was tolled. The record establishes that plaintiffs filed the

complaint more than four years after being on inquiry notice of actionable RICO claims, and the

doctrine of equitable tolling does not apply for the foregoing reasons. Therefore, I recommend

that the court grant defendants' motions to dismiss.[10]

## B. Sufficiency of the RICO Claim

Having determined that the pending action was not filed within the applicable statute of

limitations, the court next conducts an alternative evaluation regarding the sufficiency of

plaintiffs' claims pursuant to Rule 12(b)(6). I recommend that the court alternatively grant the

pending motions to dismiss for failure to state a claim upon which relief can be granted under

Rule 12(b)(6).

### 1. Elements of a RICO claim

To adequately plead a civil RICO cause of action pursuant to 18 U.S.C. § 1962(c), a

plaintiff must establish "(1) the existence of a RICO enterprise; (2) the existence of a pattern of

racketeering activity; (3) a nexus between the defendant, the pattern of racketeering activity or

the RICO enterprise; and (4) resulting injury to plaintiff, in his business or property." *Murphy v.*

---

[10] Defendants Eizen and Walsh incorporated by reference the statute of limitations arguments
presented by the RAM Defendants in support of their Rule 12(b)(6) motions. (D.I. 65 at 1; D.I.
68 at 7-9)

*Bancroft Constr. Co.*, C.A. No. 02-453-SLR, 2002 WL 31641641, at *3 (D. Del. Nov. 15, 2002)

(citing *Klapper v. Commonwealth Realty Trust*, 657 F. Supp. 948, 953 (D. Del. 1987)).

### a.   "Enterprise"

Under the RICO statute, an "enterprise" is defined as "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a

continuing unit that functions with a common purpose." *Valcom, Inc. v. Vellardita*, 2014 WL

1628431, at *5 (D.N.J. Apr. 23, 2014) (quoting *Boyle v. United States*, 556 U.S. 938, 948

(2009)). This type of enterprise "requires three things: structure, continuity, and distinctness."

*Id.* Although the three requirements are not necessary at the pleading stage, a plaintiff must

plausibly plead the existence of an enterprise structure to survive a motion to dismiss. *Id.*

(internal citations and quotation marks omitted). The Supreme Court has stated that the

definition of a RICO enterprise set forth in 18 U.S.C. § 1961(4) "has a wide reach, and the very

concept of an association in fact is expansive." *Boyle*, 556 U.S. at 944 (internal citations

omitted).

By way of their motion, the RAM Defendants challenge the sufficiency of the structure

and distinctness requirements of an association-in-fact. (D.I. 64 at 23-24) Turning first to the

sufficiency of the allegations pertaining to the Enterprise's structure in the second amended

complaint, the court notes that an enterprise must have three structural features: (1) a common

purpose, (2) relationships among those associated with the enterprise, and (3) sufficient longevity

to pursue the enterprise's common purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The RAM Defendants do not challenge the existence of relationships among those associated

30

with the Enterprise, but instead challenge a lack of specificity regarding the timing of the Enterprise's formation and the decision-making hierarchy of the Enterprise.

Plaintiffs have sufficiently pleaded the required structural elements of an association-in-fact enterprise. The second amended complaint alleges that the Enterprise was formed in 1997 and continued through the date of the filing of the second amended complaint for a period of more than fifteen years. (D.I. 47 at ¶¶ 1, 397) The duration of the Enterprise, as pleaded in the second amended complaint, satisfies the longevity requirement at this stage of the proceedings.

Plaintiffs also sufficiently pleaded the hierarchical decision-making structure in the second amended complaint, identifying Mirra as the primary decision-maker, followed by Troilo, Molieri, Kolleda, Eizen, Kovinsky, and Tropiano, followed by other Enterprise members. (*Id.* at ¶¶ 4-5, 20-36, 393) The Third Circuit has stated that, "[a]fter *Boyle*, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." *In re Ins. Brokerage*, 618 F.3d 300, 368 (3d Cir. 2010) (quoting *United States v. Hutchinson*, 573 F.3d 1011, 1021) (10th Cir. 2009) (internal quotation marks omitted)). The Third Circuit has made clear that, "[t]o the extent our cases have interpolated additional requirements into the statute, they are abrogated by *Boyle*." *Id.* Plaintiffs' second amended complaint therefore sufficiently alleges an association-in-fact enterprise with respect to structural requirements.

Next, the RAM Defendants contend that the second amended complaint fails to distinguish between the pattern of racketeering activity and the purpose of the Enterprise's existence. (D.I. 64 at 24-25) Specifically, the RAM Defendants point to paragraph 398 of the second amended complaint, which states that "[t]he Enterprise's business is racketeering activity, inasmuch as the enterprise [sic] exists for the purpose of stealing Plaintiffs' assets through

predicate acts of mail fraud, wire fraud, and financial institution fraud." (D.I. 47 at ¶ 398)

However, the second amended complaint also alleges that "[t]he Enterprise is distinct from and

has an existence beyond the pattern of racketeering that is described herein." (*Id.* at ¶ 395)  The

Supreme Court has held that "proof of a pattern of racketeering activity may be sufficient in a

particular case to permit a jury to infer the existence of an association-in-fact enterprise,"

observing that "evidence used to prove the pattern of racketeering activity and the evidence

establishing an enterprise 'may in particular cases coalesce.'" *Boyle*, 556 U.S. at 947, 951

(quoting *Turkette*, 452 U.S. at 583).  In view of the foregoing, the court concludes that the

second amended complaint sufficiently pleads the existence of the Enterprise.

### b.    Pattern of predicate acts

"A pattern of racketeering activity requires at least two predicate acts of racketeering."

*Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated in part on other grounds by*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); 18 U.S.C. § 1961(1), (5).  The RAM

Defendants challenge the sufficiency of the predicate acts identified in the second amended

complaint and assert that plaintiffs failed to plead a pattern of racketeering activity based on

those predicate acts.

### (i)    Use of interstate wires

In support of their motion to dismiss, the RAM Defendants contend that the predicate

acts in the second amended complaint lack adequate factual support because they do not allege

the use of interstate wires as required under the RICO statute.  (D.I. 64 at 16)  In response,

plaintiffs cite paragraph 397 of the second amended complaint, which alleges "repeated

violations of the federal wire fraud statute, 18 U.S.C. § 1343, by causing the interstate wires to

be used hundreds of times on a continuous basis for over 15 years to execute their fraudulent

scheme." (D.I. 47 at ¶ 397)  Plaintiffs do not identify any other specific mention of interstate

wire transfers contained in the second amended complaint.

      The Third Circuit's requirement that RICO complaints based on allegations of wire fraud

must allege interstate use of the wire for each and every predicate act is not met in the second

amended complaint.  The wire fraud statute criminalizes schemes to defraud transmitted by wire

"in interstate or foreign commerce." 18 U.S.C. § 1343.  The Third Circuit has held that, in light

of the foregoing, a RICO complaint based on allegations of wire fraud "must allege *interstate* use

of the wire for each predicate act." *Stanley v. Int'l Bhd. of Elec. Workers, AFL-CIO CLC*, 207 F.

App'x 185, 189 (3d Cir. 2006) (emphasis in original) (citing *Smith v. Ayers*, 845 F.2d 1360, 1366

(5th Cir. 1988)).

      Section 1962(c) provides that it is "unlawful for any person employed by or associated

with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18

U.S.C. § 1962(c).  Racketeering activity includes mail or wire fraud pursuant to 18 U.S.C. §

1961(1), and pleading a "pattern" of racketeering activity requires at least two such acts, 18

U.S.C. § 1961(5).  Federal Rule of Civil Procedure 9(b) requires that fraud, including mail and

wire fraud, be pleaded with specificity. *Grant v. Turner*, 505 F. App'x 107, 111 (3d Cir. 2012);

*Lum*, 361 F.3d at 223.  Accordingly, plaintiffs must plead the circumstances of the alleged fraud

with sufficient detail to place the defendants on notice of the precise misconduct. *Id.*

      Paragraph 397 of the second amended complaint generally refers to "repeated violations

of the federal wire fraud statute, 18 U.S.C. § 1343, by causing interstate wires to be used

hundreds of times on a continuous basis for over 15 years to execute their fraudulent scheme,"

but this one reference to interstate wire transfers is insufficient to meet the Rule 9(b) standard

pursuant to the Third Circuit's decision in *Stanley*. 207 F. App'x at 189.  The allegations more

specifically identifying fraudulent wire transfers do not allege interstate use of the wires.  (D.I.

47 at ¶¶ 91, 98, 163)  The Third Circuit has cautioned against "a strange state of affairs in which

a complaint could withstand a motion to dismiss simply through a plaintiff's formulaic recitation

of the statutory RICO elements." *In re Schering-Plough Corp. Intron/Temodar Consumer Class

Action*, 2009 WL 2043604, at *11 (D.N.J. July 10, 2009).  Inserting the word "interstate" into

one paragraph of a complaint alleging a multitude of separate fraudulent transfers is insufficient

to meet the requisite legal standard, particularly where, as here, the second amended complaint

does not identify any of the states involved in any of the transfers.

### (ii)   Group pleading

Next, the RAM Defendants contend that the allegations in the second amended complaint

constitute group pleading insufficient to meet the Rule 9(b) standard.  (D.I. 64 at 18-20)

Plaintiffs do not contest the RAM Defendants' group pleading characterization, but instead

allege that group pleading is accepted when the defendants act to facilitate a general scheme,

especially when more detailed information is exclusively within the defendants' control.  (D.I. 73

at 22-26)

The second amended complaint in the present action constitutes improper group pleading

pursuant to Rule 9(b) because it is unclear which defendants are precisely charged with the

forgeries and who transmitted the forged documents in each instance.  *See Grant v. Shapiro &

Burson, LLP*, 871 F. Supp. 2d 462, 474-75 (D. Md. 2012) (holding that the complaint failed to

adequately allege a pattern of racketeering activity in part because it did not reveal the identity of

the party who forged the signatures).  Plaintiffs' reliance on the Third Circuit's decision in *Grant

v. Turner* is inapposite because the Third Circuit based its decision on the fact that the defendants

34

were on notice of the precise misconduct charged against them.  505 F. App'x 107, 112 (3d Cir.

2012).  In contrast, the allegations in the present case grouped together seven defendants accused

of forging and transmitting Jordan's signature, without distinguishing the separate roles of each

defendant.  (D.I. 47 at ¶¶ 91, 98, 163)  Although the second amended complaint identifies the

dates of the forgeries, details regarding the use of the mails and wires are lacking for the reasons

previously discussed in connection with the interstate wire transfers.  Other details included in

the second amended complaint, such as the amounts of the allegedly fraudulent transfers, the

account numbers from which the transfers were made, and the recipients of the transfers, are

insufficient to inject precision into the fraud allegations because they do not specifically identify

who committed the alleged fraud.

Unlike the circumstances in *Grant v. Turner*, plaintiffs do not allege that Mirra, Troilo,

Molieri, Kolleda, Kovinsky, Tropiano, and Walsh deliberately concealed their identities.  Even

in light of these factual differences, the Third Circuit in *Grant v. Turner* stressed "the closeness

of this question."  *Turner*, 505 F. App'x at 112.  For these reasons, plaintiffs' group pleading

allegations are deficient.

### (iii)   Standing to bring bank fraud claims

The RAM Defendants allege that only defrauded banks have standing to sue for bank

fraud under RICO.  (D.I. 64 at 16 n.15)  In response, plaintiffs indicate that the definition of

racketeering activity includes bank fraud under 18 U.S.C. § 1962, which provides a remedy for

"any person."  (D.I. 73 at 28-31)

The RAM Defendants are correct that only financial institutions may claim bank fraud

under 18 U.S.C. § 1344 as a predicate act for purposes of a RICO claim.  *See Yesko v. Fell*, 2014

WL 4406849, at *11 (D. Md. Sept. 5, 2014) (citing a series of cases from jurisdictions

throughout the United States supporting this proposition); *see also Nelson v. Nelson*, 2015 WL 4136339, at \*7 (D. Minn. July 8, 2015). Plaintiffs' repeated references to the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) are inapposite because the Supreme Court did not address the issue of whether non-banks can assert bank fraud as a RICO predicate. Instead, the Supreme Court confirmed that plaintiffs must plead that their injuries were the direct result of the defendant's predicate act. *Bridge*, 553 U.S. at 658. The banks, as the direct victims of the alleged fraud, are in a better position to bring those claims.

### (iv)    Pattern of racketeering activity

The RAM Defendants allege that the second amended complaint fails to allege any predicate acts and, therefore, no pattern of racketeering activity can be established. (D.I. 64 at 22) Even if the court concludes that plaintiffs properly alleged two or more predicate acts with sufficient particularity, the RAM Defendants argue that plaintiffs have failed to establish a pattern because the predicate acts were directed to a single person, and plaintiffs do not allege a threat of continued criminal activity. (*Id.*) In response, plaintiffs contend that the second amended complaint names four plaintiffs and identifies particularized injuries with respect to each one. (D.I. 73 at 32) According to plaintiffs, the allegations in the second amended complaint sufficiently describe closed-ended continuity consisting of a series of related predicate acts extending over a substantial period of time. (*Id.*)

Because the court has concluded that plaintiffs failed to sufficiently plead predicate acts, plaintiffs cannot establish a pattern of racketeering activity consisting of at least two predicate acts. For these reasons, I recommend that the RAM Defendants' motion to dismiss be granted with respect to plaintiffs' RICO claim.

### c.    Nexus

The RAM Defendants next allege that plaintiffs failed to establish the requisite nexus between certain members of the Enterprise and the alleged pattern of racketeering activity to state a viable RICO claim. (D.I. 64 at 25-27) Specifically, the RAM Defendants note that RAM Capital and RAM Realty are described only as holding companies who passively received certain wire transfers in the second amended complaint, and no distinct role was alleged for Molieri, Kovinsky, or Tropiano in the second amended complaint. (*Id.*) The RAM Defendants did not challenge the sufficiency of the nexus requirement as it pertains to Mirra, Troilo, and Kolleda, aside from reiterating the deficiencies in the second amended complaint regarding the requirement of establishing a pattern of racketeering activity.

In response, plaintiffs contend that the second amended complaint contains facts demonstrating that RAM Capital and RAM Realty knowingly received plaintiffs' money pursuant to multiple forgeries. (D.I. 73 at 44-45) Moreover, plaintiffs allege that the second amended complaint pleads that Molieri, Kovinsky, and Tropiano controlled RAM Capital and RAM Realty under Mirra's direction, supervised other members of the Enterprise, and forged Jordan's signature. (D.I. 73 at 45-46)

A RICO defendant must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Consequently, "the nexus element requires a plaintiff to show that the defendant participated in the conduct of the enterprise's affairs . . . through – that is, by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of – a pattern of racketeering activity." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 (3d Cir. 2010) (internal citations and quotation marks omitted); *see also Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Plaintiffs' claims against RAM Capital and RAM Realty[11] fail under the nexus factor because the Third Circuit has held that a corporate enterprise is not liable under § 1962(c) for allegations involving a defendant officer conducting a pattern of racketeering activity through the corporate enterprise. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 268 (3d Cir. 1995). The allegations in paragraphs 21 to 27 of the second amended complaint identify that each of the individual defendants "controlled RAM Capital, RAM Realty, and other members of the Enterprise," and do not allege that the corporate entities themselves directed the affairs of the Enterprise. (D.I. 47 at ¶¶ 21-27) Paragraphs 91, 98, and 163 identify RAM Capital as the recipient of various transfers, but nothing in the second amended complaint supports plaintiffs' contention that RAM Capital "knowingly" received millions of dollars of plaintiffs' money as a result of the forgeries. (*Id.* at ¶¶ 91, 98, 163; D.I. 73 at 44) Likewise, paragraphs 285, 348, and 352 allege that RAM Realty received certain property, and certain property was titled in the name of RAM Realty as a result of the forgeries of Mirra, Troilo, Kolleda, and Tropiano, but these allegations fall short of demonstrating that RAM Realty "knowingly engaged in these acts." (D.I. 47 at ¶¶ 285, 348, 352; D.I. 73 at 45)

With respect to defendants Molieri, Kovinsky, and Tropiano, the allegations in the second amended complaint fail to establish a nexus because their connection to the Enterprise appears only in generic descriptions of their employment, without identifying a distinct role in the operation or management of the Enterprise. The second amended complaint generically states that Molieri, Kovinsky, and Tropiano "engaged in [activities] on behalf of the Enterprise,"

---

[11] The RAM Defendants note that an entity listed in the case caption and paragraph 3 of the second amended complaint, RAM Capital II, is not mentioned elsewhere in the complaint. Plaintiffs do not challenge this assertion. Consequently, RAM Capital II should be dismissed from this action pursuant to Rule 12(b)(6).

and were directed by Mirra. (D.I. 47 at ¶ 21) Paragraph 24 identifies Molieri as an attorney who

"participated in the operation and management of the Enterprise," supervised other members of

the Enterprise, and forged Jordan's signature or caused it to be forged. (*Id.* at ¶ 24) Paragraphs

26 and 27 identify Kovinsky and Tropiano's roles in the Enterprise in a similarly vague and

generic manner. (*Id.* at ¶¶ 26-27) To the extent that Molieri, Kovinsky, and Tropiano are

mentioned in connection with a predicate act, such as the forgeries, the court previously rejected

the sufficiency of such allegations based on improper group pleading. For these reasons, the

second amended complaint fails to identify a sufficient nexus with respect to RAM Capital,

RAM Realty, Molieri, Kovinsky, and Tropiano, and I recommend that the court grant the motion

to dismiss with respect to these defendants.

### 3.  Conspiracy racketeering claim

As a preliminary matter, a claim for conspiracy racketeering pursuant to § 1962(d) must

fail if the substantive RICO claim is deficient. *See Kolar v. Preferred Real Estate Invs., Inc.*,

361 F. App'x 354, 366 (3d Cir. 2010). Plaintiffs' conspiracy claim must fail for this reason.

However, even if plaintiffs' RICO claim were to survive, I recommend that the court grant the

motion to dismiss as it pertains to the conspiracy racketeering claim for the following reasons.

To state a claim for conspiracy racketeering, plaintiffs must allege their "(1) agreement to

commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of

racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c)." *Odesser v.

Continental Bank*, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987). A plaintiff is not required to plead

that a defendant himself agreed to commit predicate acts, but only to allege facts indicating that

he knew of, and agreed to, the general criminal objective of a scheme. *Salinas v. United States*,

522 U.S. 52, 63-64 (1997); *see also In re Ins. Brokerage*, 618 F.3d at 372-73.

39

The RAM Defendants allege that the second amended complaint's assertion that Stewart, Sigloch, Forte, Hall, Demora, and Kuo "knowingly carried out . . . acts in furtherance of the conspiracy to aid the Enterprise" falls short of showing an agreement to commit the predicate acts. (D.I. 64 at 28)  According to the RAM Defendants, nothing in the second amended complaint suggests that these junior administrative personnel and notaries knowingly agreed to participate in the fraud; in fact, the second amended complaint alleges that other RAM Defendants caused the forgeries to be falsely witnessed by their employees. (*Id.* at 28-29) Moreover, the second amended complaint fails to allege that Forte, Kuo, and Demora even participated in two or more acts, as each is only alleged to have witnessed a single forgery. (*Id.* at 29)  With respect to Sigloch, the RAM Defendants allege that although he witnessed the execution of four HM Trust documents, the Court of Chancery ruled that those documents were not fraudulent. (*Id.*)

In response, plaintiffs allege that a plaintiff is not required to plead that a defendant agreed to commit predicate acts, but only that he knew of and agreed to the general criminal objective of a scheme. (D.I. 73 at 50)  According to plaintiffs, the second amended complaint sufficiently alleges that Stewart, Sigloch, Forte, Hall, Demora, and Kuo falsely notorized and witnessed many of the forged documents without Jordan's presence. (*Id.*)

I recommend that plaintiffs' conspiracy racketeering claim be dismissed in the event that the RICO claim survives because the second amended complaint contains no allegation that Stewart, Sigloch, Forte, Hall, Demora, and Kuo knew of and agreed to the overarching scheme to defraud plaintiffs of over $200 million.  Moreover, the second amended complaint identifies participation of Forte, Kuo, and Demora in only one forgery, which falls short of participation in two or more acts as required under the statute.

### 4.    Supplemental jurisdiction

The RAM Defendants further allege that plaintiffs' third state law cause of action for

non-payment of the 2005 promissory note should be dismissed in the event that the first and

second federal causes of action are dismissed. (D.I. 64 at 29)  Plaintiffs respond that the court

should retain jurisdiction over the third cause of action because the first two causes of action are

not subject to dismissal. (D.I. 73 at 54-55)  The "district court may decline to exercise

supplemental jurisdiction over a claim if 'the district court has dismissed all claims over which it

has original jurisdiction.'" *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009)

(quoting 28 U.S.C. § 1367(c)(3)).  "If it appears that the federal claim is subject to dismissal

under Fed. R. Civ. P. 12(b)(6) . . . then the court should ordinarily refrain from exercising

jurisdiction in the absence of extraordinary circumstances." *Cito v. Bridgewater Twp. Police

Dep't*, 892 F.2d 23, 25-26 (3d Cir. 1989) (quoting *Tully v. Mott Supermarkets, Inc.*, 540 F.2d

187, 196 (3d Cir. 1976)).  In light of the foregoing recommendation to dismiss the first and

second causes of action, I recommend that the court decline to exercise supplemental jurisdiction

over the third cause of action. *See Grubbs v. Univ. of Del. Police Dep't*, --- F. Supp. 3d ----,

C.A. No. 15-195-SLR, 2016 WL 1238923, at *11 (D. Del. Mar. 29, 2016) (declining to exercise

supplemental jurisdiction over remaining state law claims after dismissing federal claims against

defendants).

### B.    Motion to Dismiss filed by Bernard Eizen

#### 1.    Enterprise

In support of his motion to dismiss, Eizen contends that he did not conduct or participate

in the affairs of the alleged Enterprise as a leader or manager. (D.I. 65 at 2-3)  Eizen alleges that

his performance of legal services for the purported Enterprise does not amount to operating or

managing the Enterprise. (*Id.* at 4-5)  In response, plaintiffs contend that RICO liability extends

to any participant who is under the direction of upper management if the participant furthers the

illegal aims of the enterprise by carrying out the directives of those in control.  (D.I. 73 at 46)

According to plaintiffs, the second amended complaint alleges facts indicating that Eizen and

Walsh carried out the directives of those in control and managed the day-to-day operations of the

Enterprise with actual knowledge of the underlying scheme.  (*Id.*)

     A specific type of participation, meaning "to lead, run, manage, or direct," is required to

constitute participation in a RICO enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 177-78

(1993).  The second amended complaint does not contain allegations that Eizen directed the

Enterprise, but rather alleges that he carried out the directions of those in control.  There are no

specific allegations in the second amended complaint supporting plaintiffs' claim that Eizen had

actual knowledge of the scheme or managed the day-to-day operations of the Enterprise.

Conclusory allegations that Eizen "supervised the day-to-day operations of the Enterprise,"

without additional factual support, constitute formulaic recitations of the elements that are

insufficient to meet the *Twombly* pleading standard.  (D.I. 47 at ¶ 393)

     Providing professional services alone is not sufficient to constitute participation in the

Enterprise, even if Eizen knew of the Enterprise's illicit nature, unless Eizen is also alleged to

have directed the Enterprise. *See Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996

F.2d 1534, 1538-39 (3d Cir. 1993) ("Simply because one provides goods or services that

ultimately benefit the enterprise does not mean that one becomes liable under RICO as a

result."); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply

performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is

not enough to subject an individual to RICO liability under § 1962(c); instead, the individual

must have participated in the operation and management of the enterprise itself."). The case law cited by plaintiffs in support of RICO liability for professionals confirms that such professionals may only be liable under RICO if their tasks "entail the 'operation or management' of an enterprise." *Marshall v. Fenstermacher*, 2007 WL 2892938, at *9 (E.D. Pa. Oct. 2, 2007). In the absence of pleaded allegations that Eizen directed the affairs of the Enterprise, Eizen's provision of professional services is insufficient to establish his participation in the Enterprise for purposes of stating a RICO claim.

### 2. Pattern of racketeering activity

Next, Eizen alleges that plaintiffs have failed to plead at least two predicate acts committed by Eizen, and the second amended complaint does not allege that the racketeering acts are related or pose a threat of continued criminal activity. (D.I. 65 at 7) According to Eizen, his communications with Walsh and legal counsel for Jordan do not establish a pattern of racketeering activity because the communications were not deceptive, they do not satisfy the "continuity" requirement, and plaintiffs did not sustain an injury as a result of reliance on the letters. (*Id.* at 8-12) In response, plaintiffs allege that Eizen's participation in the forgeries, and use of the mails and wires to transmit forgeries, are temporally sufficient to allege closed-end scrutiny during the period between 2003 and 2007. (D.I. 73 at 35) Plaintiffs contend that the letters Eizen sent between April and October 2010 contained misrepresentations and were intended to further Defendants' fraudulent scheme. (*Id.* at 35-36)

For the reasons previously stated, the group pleading allegations in the second amended complaint are insufficient to establish Eizen's involvement in two or more predicate acts. To the extent that the second amended complaint alleges that Eizen sent a series of letters between April and October 2010 that constitute a pattern of racketeering activity, the allegations fail to state a

43

claim because the time period is too short to establish continuity. *See Hughes v. Consol-Pa. Coal Co.*, 945 F.2d 594, 610-11 (3d Cir. 1991) (fraudulent conduct lasting twelve months was insufficient to form a pattern of racketeering activity); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 (3d Cir. 1991) (fraudulent conduct lasting eight months was insufficient to form a pattern of racketeering activity).  Moreover, plaintiffs have failed to plead that they relied on Eizen's letters or suffered an injury resulting from Eizen's letters, independent of the underlying RICO scheme.  Therefore, plaintiffs have failed to sufficiently plead a pattern of racketeering activity against Eizen in support of their RICO claim.  I recommend dismissal of the RICO claim as it pertains to Eizen.

### C.    Motion to Dismiss filed by Patrick Walsh

#### 1.    Statute of limitations

Walsh joins in the arguments presented by the RAM Defendants in support of their motion to dismiss regarding plaintiffs' failure to pursue their RICO claims within the four-year statute of limitations period.  (D.I. 68 at 6)  In addition, Walsh alleges that the claims against him are untimely because every allegation in the second amended complaint concerning Walsh occurred between February 2003 and April 2007.  (*Id.* at 7)  Walsh further contends that plaintiffs' allegations are not specific enough to meet the strict pleading requirements for tolling the statute of limitations.  (*Id.* at 7-8)

For the reasons set forth above in connection with the RAM Defendants' motion to dismiss based on the statute of limitations, I recommend that the court dismiss the claims alleged against Walsh in the second amended complaint.

## 2.    Sufficiency of RICO claims

Walsh echoes the allegations set forth by the RAM Defendants regarding the deficiencies

in plaintiffs' RICO claims. (D.I. 68 at 9)  In addition, Walsh indicates that the second amended

complaint fails to establish a nexus between Walsh and the alleged predicate acts because he

served as a neutral provider of brokerage services to Jordan and played no role in directing the

alleged Enterprise's affairs.  (*Id.* at 9-10)  Walsh contends that second amended complaint

contains allegations illustrating that Walsh was actually at odds with the Enterprise and was

fraudulently misled by the other defendants, and there are no allegations suggesting that Walsh

benefited from the Enterprise.  (*Id.* at 11-12)  In response, plaintiffs cite to portions of the second

amended complaint alleging that Walsh knowingly forged Jordan's signature and authorized the

creation of fraudulent accounts necessary to the scheme. (D.I. 73 at 47)

For the reasons previously stated, the group pleading allegations in the second amended

complaint are insufficient to establish Walsh's involvement in the RICO scheme.  Moreover, the

second amended complaint contains numerous assertions that the RAM Defendants and Eizen

committed forgeries and established Merrill Lynch accounts without expressly naming Walsh,

but rather stating that Merrill Lynch relied upon the documents presented by the RAM

Defendants as genuine.  (D.I. 47 at ¶¶ 134, 138, 141, 144, 147, 152-53, 184-85, 187)  This

pattern refutes plaintiffs' characterization of Walsh in the briefing as a participant in the

underlying scheme, and certain allegations in the second amended complaint suggest that Walsh

was also misled by the misrepresentations.  Consequently, I recommend that the court grant

Walsh's motion to dismiss the RICO claim.

45

### 3.   Arbitration

In the alternative, Walsh alleges that the claims against him should be arbitrated pursuant

to the terms of the Merrill Lynch Client Relationship Agreement.  (D.I. 68 at 14)  Walsh

contends that he has standing to enforce the agreement as an employee of Merrill Lynch, and the

scope of the agreement is broad enough to encompass this issue.  (*Id.* at 14-15)  In response,

plaintiffs allege that the claims are not arbitrable because Walsh was a non-signatory to the

arbitration agreement who acted outside the scope of his employment with Merrill Lynch by

conspiring with his co-defendants to commit forgery and fraud.  (D.I. 73 at 51)

Walsh's argument for enforcement of the arbitration clause is moot by virtue of the

court's previous recommendations for dismissal of the action.  In the event that this Report and

Recommendation is overruled, Walsh may renew his claim for arbitration under the Merrill

Lynch Client Relationship Agreement.

### C.   Motion for Sanctions

#### 1.   Legal standard

Rule 11 of the Federal Rules of Civil Procedure provides that:

> By presenting to the court a pleading, written motion, or other paper . . . an
> attorney . . . certifies that to the best of the person's knowledge, information, and
> belief, formed after an inquiry reasonable under the circumstances: (1) it is not
> being presented for any improper purpose, such as to harass, cause unnecessary
> delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and
> other legal contentions are warranted by existing law . . .; (3) the factual
> contentions have evidentiary support or, if specifically so identified, will likely
> have evidentiary support after a reasonable opportunity for further investigation or
> discovery; and (4) the denials of factual contentions are warranted on the evidence
> or, if specifically so identified, are reasonably based on belief or lack of
> information.

Fed. R. Civ. P. 11(b).  "Once a litigant moves based upon non-frivolous allegations for a Rule 11

sanction, the burden of proof shifts to the non-movant to show it made a reasonable pre-suit

inquiry into its claim." *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) (citing *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000)). A party who fails to "make a reasonable inquiry into the factual and legal legitimacy of the pleading . . . shall be sanctioned." *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994); *see also Thomas v. Shaw*, --- F. App'x ----, 2015 WL 7752836, at *4 (3d Cir. 2015) ("[T]he meaning of the Rule is plain: A party who signs a pleading or other paper without first conducting a reasonable inquiry may be sanctioned."). The Third Circuit has explained that the goal of Rule 11 is to "impose[] on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'" *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988) (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986)). The Rule 11 inquiry is an objective test of reasonableness to discourage pleadings having no factual basis, even in the absence of subjective bad faith by the filer. *Thomas*, 2015 WL 7752836, at *4; *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995); *see also Lony v. E.I. du Pont de Nemours & Co.*, 935 F.2d 604, 616 (3d Cir. 1991). The Supreme Court has explained that, "to determine whether an attorney's prefiling inquiry was reasonable, a court must consider all the circumstances of a case." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990), *superseded by statute on other grounds*.

As a preliminary matter, the parties disagree as to the applicable legal standard. Specifically, plaintiffs allege that Rule 11 sanctions may only be imposed under "exceptional circumstances," when a "claim or motion is patently unmeritorious or frivolous." (D.I. 270 at 11) The RAM Defendants contend that Rule 11 sanctions may be imposed upon a showing of objectively unreasonable conduct, and the cases cited by plaintiffs applying the "patently unmeritorious or frivolous" standard predate the 1993 amendments to Rule 11. (D.I. 284 at 2)

47

The cases cited by plaintiffs applying the "patently unmeritorious or frivolous" standard remain good law in the Third Circuit. *See Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (citing *Doering v. Union Cty. Bd.*, 857 F.2d 191, 194 (3d Cir. 1988); *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988)).  However, the Third Circuit specifically held that the "patently unmeritorious or frivolous" standard does not apply to sanctions predicated on the duty to make a reasonable inquiry, thereby distinguishing its decision in *Doering*:

> Levin and Sklar seek to avoid sanctions by citing language from our opinions in *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988), and *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987), that Rule 11 should be applied only in "exceptional circumstances" or where the document "is patently unmeritorious or frivolous." But these cases can be of no comfort to Levin and Sklar. As we have made clear, the sanctions in this case were not predicated on a conclusion by the court that the *Garr* complaint was unmeritorious. The Rule 11 problem is that neither Levin nor Sklar made a reasonable inquiry as required by Rule 11 before signing the complaint. Furthermore, the suggestion that Rule 11 should be used only in "exceptional circumstances" was intended to explain that sanctions were not to be imposed merely because there is a disagreement as to the correct resolution of a matter in litigation. *Gaiardo*, 835 F.2d at 483.

*Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1281 (3d Cir. 1994). The RAM Defendants' motion for sanctions in the present case is based upon the sufficiency of plaintiffs' pre-filing investigation. (D.I. 284 at 2-3) Therefore, the court will apply the standard of objective reasonableness in accordance with *Garr*.

The Third Circuit has set forth five factors to consider in determining the reasonableness of counsel's pre-filing inquiry. They include: (1) the amount of time available to the signer for conducting the factual and legal investigation; (2) the necessity for reliance on a client for the underlying factual information; (3) the plausibility of the legal position advocated; (4) whether the case was referred to the signer by another member of the bar; and, (5) the complexity of the

legal and factual issues implicated. *Blancato v. St. Mary Hosp.*, 1993 WL 114421, at \*5 (E.D. Pa. Apr. 12, 1993) (citing *Mary Ann Pensiero, Inc.*, 847 F.2d at 95). The parties address the first three factors in their submissions.

### 2.    Timeliness of the motion for sanctions

Addressing the first factor, plaintiffs allege that the RAM Defendants' motion is untimely because they waited until fourteen months after the filing of the second amended complaint to file the pending motion for sanctions. (D.I. 270 at 17) Moreover, plaintiffs contend that a Rule 11 motion cannot be determined before the end of the litigation. (*Id.* at 17-18) In response, the RAM Defendants allege that the motion for sanctions is timely because it was filed before the entry of a final judgment, soon after the production of the Farella Braun documents, and after the expiration of the safe harbor period set forth in Rule 11. (D.I. 284 at 8-9)

The RAM Defendants' motion for sanctions is not untimely. Although Rule 11 motions should be filed as soon as practicable after discovery of the violation and must be filed before the entry of a final judgment, *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 100 (3d Cir. 1988), "Rule 11 . . . says nothing about how long the movant may wait to file the motion after the 21 day safe harbor has expired," *Telesaurus VPC, LLC v. Power*, 888 F. Supp. 2d 963, 971 (D. Ariz. 2012). In certain cases, a Rule 11 motion may be considered premature if the parties have not engaged in meaningful discovery. *Telesaurus*, 888 F. Supp. 2d at 971; *see also* Fed. R. Civ. P. 11, Advisory Committee Notes to 1993 Amendments (noting that, in some circumstances, a Rule 11 motion "should not be served until the other party has had a reasonable opportunity for discovery.").

In the present case, the second amended complaint was filed on July 9, 2014. (D.I. 47) However, Farella Braun did not complete its production of documents in response to the RAM

Defendants' subpoena until April 22, 2015. (D.I. 285, Ex. 27)  The RAM Defendants raised

plaintiffs' awareness to deficiencies in the second amended complaint on August 25, 2015,

initiating the twenty-one day safe harbor period pursuant to Rule 11(c), and waited for the safe

harbor period to expire before filing their motion. (D.I. 260, Ex. 1)  The RAM Defendants

subsequently filed their motion for sanctions on September 18, 2015. (D.I. 258)  The RAM

Defendants filed their Rule 11 motion promptly after the Farella Braun documents were

produced.  Because the Farella Braun documents are critical to the arguments raised in support of

the RAM Defendants' motion for sanctions, the court concludes that the RAM Defendants'

motion for sanctions was timely filed under the circumstances.

### 3.    Reliance on client's factual information & plausibility of legal position

Turning to the second and third factors, the court notes that "Rule 11 requires an attorney

to do more than merely rely on a client's version of the facts before certifying that a claim is

well-grounded in fact." *Fleekop v. Mann Music Ctr.*, 1990 WL 204253, at *4 (E.D. Pa. Dec. 12,

1990) (citing *Mary Ann Pennsiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988)).  Although an

attorney is not required to disbelieve a client, the reasonableness of an attorney's reliance on the

client's story depends on the circumstances. *Ellis v. Beemiller, Inc.*, 287 F.R.D. 326, 330 (W.D.

Pa. 2012) (citing *CTC Imports & Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 579 (3d

Cir. 1991)).  "'[R]easonable inquiry' surely requires more than a lawyer's uncritical blindness to

the incredibility of his client's statements." *Turner Constr. Co. v. First Indem. of Am. Ins. Co.*,

829 F. Supp. 752, 771 (E.D. Pa. 1993).  Consequently, Rule 11 imposes an affirmative duty on

counsel to conduct a reasonable investigation into the factual basis of the client's claim to ensure

that the submissions are factually well-grounded. *Ellis*, 287 F.R.D. at 337.

50

In the present case, the RAM Defendants allege that counsel's interviews with Jordan are not enough to constitute a sufficient pre-filing investigation because Jordan's allegations are facially implausible. (D.I. 259 at 9-10)  According to the RAM Defendants, Jordan's contention that Mirra would agree to remove a paragraph of the mutual Release to eliminate the mutuality of the agreement and cause inconsistencies with other provisions of the Release warrants further scrutiny.  (*Id.*)  Plaintiffs do not directly challenge the RAM Defendants' contentions on this point, but instead insist that they conducted a reasonable pre-filing inquiry by reviewing the documentary evidence and interviewing Jordan's Farella Braun attorneys in addition to relying on Jordan's own representations. (D.I. 270 at 12-15)

Plaintiffs have shown that, in addition to interviewing Jordan, they reviewed the documentary evidence and interviewed Jordan's Farella Braun attorneys.  In this respect, plaintiffs have conducted a proper pre-filing inquiry.  The documentary evidence sufficiently supports Jordan's allegations.  Although there is no express mention of paragraph 3 in the email exchange regarding revisions to the Release before its execution, counsel's proposed interpretation of the email stating, "Looks like we're getting it all," could potentially support Jordan's version of events following additional information revealed during fact discovery. Plaintiffs' counsel's multiple pre-filing interviews with Jordan's Farella Braun attorneys further establishes the sufficiency of their pre-filing investigation.

### 4.     **Withholding of documents**

Plaintiffs contend that the RAM Defendants cannot fault them for lack of continuing inquiry into the basis of their claims because the RAM Defendants have withheld material information, including email correspondence between Troilo, Mirra, and Jordan's Farella Braun attorneys, during discovery.  (D.I. 270 at 15-16; D.I. 271 at ¶ 20)  Plaintiffs also allege that the

51

RAM Defendants failed to produce a copy of the final SDA. (D.I. 270 at 15-16; D.I. 271 at ¶ 21-25) In response, the RAM Defendants note that any alleged deficiencies in their production are irrelevant to the adequacy of plaintiffs' pre-filing inquiry, and the RAM Defendants produced email correspondence between Troilo and Farella Braun by September 24, 2014. (D.I. 284 at 7-8) According to the RAM Defendants, production of a final version of the SDA would not resolve the question of whether Petersen obtained Mirra's agreement to strike paragraph 3 of the Release during an undocumented telephone conversation. (*Id.* at 8)

Plaintiffs' argument regarding the RAM Defendants' failure to produce documents is irrelevant to the sufficiency of plaintiffs' pre-filing investigation. "Rule 11 creates and imposes on a party or counsel an affirmative duty to investigate the law and facts before filing." *Telesaurus*, 888 F. Supp. 2d at 972 (quoting *Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d 944, 950 (E.D. Cal. 2005)). To the extent that plaintiffs allege that deficiencies in the document production negatively impacted plaintiffs' ability to continuously assess the validity of plaintiffs' positions, these arguments are likewise without merit. The RAM Defendants have verified that they produced email communications between Troilo and the Farella Braun attorneys relating to the negotiation of the SDA and Release on September 24, 2015, nearly two weeks before plaintiffs' answering brief was filed. (D.I. 285 at ¶ 2) The court addressed the production of a full, final copy of the SDA during a discovery dispute hearing on October 28, 2015. Specifically, the court ruled "the RAM defendants have represented that a contiguous document has been produced. I have to accept that representation. All I can do is leave open an avenue of relief for the plaintiff, if that does not turn out to be the case, is to make this ruling without prejudice . . . ." (10/28/15 Tr. at 22:13-18) Plaintiffs have made no subsequent applications to the court pertaining to the "contiguous" SDA.

52

### 5.   Conclusion

In sum, plaintiffs have satisfied Rule 11's requirement to make a sufficient pre-filing investigation, and I recommend that the court deny the RAM Defendants' motion for sanctions.[12] Plaintiffs took the proper steps for conducting a pre-filing investigation by interviewing Jordan, reviewing the documentary evidence, and interviewing Jordan's former Farella Braun attorneys. This court has held that sanctions should be imposed sparingly, *see Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 556 (D. Del. 2013), and the 1993 Advisory Committee Notes to Rule 11 state that "[t]he court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct."  Consequently, I recommend that the court deny the RAM Defendants' motion for sanctions.

### D.   Motion for Leave to File Sur-Reply Brief

I recommend that the court deny plaintiffs' motion for leave to file a sur-reply brief with respect to the motion for sanctions.  "A Court may grant leave to file a sur-reply if it responds to new evidence, facts, or arguments." *St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) (citing *Belden Techs., Inc. v. LS Corp.*, C.A. No. 08-823-SLR, 2010 WL 11205228, at *1 (D. Del. July 14, 2010); *Walsh v. Irvin Stern's Costumes*, 2006 WL 166509, at *12 (E.D. Pa. Jan. 19, 2006)).  The arguments set forth in the RAM Defendants' reply brief do not necessitate the filing of a sur-reply "because they either expound on arguments made in [the RAM Defendants'] opening brief, or because they involve content that is directly responsive to arguments made in [plaintiffs'] answering brief."

---

[12] By way of their motion, the RAM Defendants request sanctions in the form of dismissal of the action with prejudice as well as monetary sanctions including attorney's fees and costs. (D.I. 259 at 11)

*Execware, LLC v. BJ's Wholesale Club, Inc. et al.*, 2015 WL 4275314, at \*2 n.3 (D. Del. July 15, 2015), *reversed in part on other grounds by Execware, LLC v. BJ's Wholesale Club, Inc.*, 2015 WL 5734434 (D. Del. Sept. 30, 2015). Plaintiffs do not attempt to establish that the RAM Defendants introduced new evidence or new arguments in their reply brief. In contrast, plaintiffs' proposed sur-reply introduces new evidence in the form of Petersen's deposition testimony. For these reasons, plaintiffs' motion for leave to file a sur-reply brief is denied.

To the extent that plaintiffs accuse the RAM Defendants of spoliation in their motion for leave to file a sur-reply brief, the court finds that it is improper to raise an independent allegation of spoliation in a motion for leave to file a sur-reply brief.

## V.    CONCLUSION

For the reasons discussed above, I recommend that the court: (1) grant the RAM Defendants' motion to dismiss (D.I. 63); (2) grant Eizen's motion to dismiss (D.I. 62); (3) grant Walsh's motion to dismiss (D.I. 67); (4) deny the RAM Defendants' motion for sanctions (D.I. 258); and (5) deny plaintiffs' motion for leave to file a sur-reply brief (D.I. 305).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

54

The parties are directed to the court's Standing Order In Pro Se Matters For Objections

Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available at

http://www.ded.uscourts.gov/court-info/local-rules-and-orders/general-orders.

Dated: June 3 , 2016

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE